*This piece requires singing into the flute + fingering simultaneously
EXHIBIT

UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank FERNANDEZ, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Roy Gavaldon, aka Spider,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

David Gonzales–Contreras, aka
David Contreras–Gonzalez,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Dominick Shewmaker Gonzales, aka
Solo, aka Dominick Gonzales,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Jimmy Sanchez, aka Seal D, aka
Smokey, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Suzanne Schoenberg Sanchez,
Defendant–Appellant.

Nos. 01–50082, 01–50162, 01–50088,
01–50373, 01–50126, 01–50513.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 2004.

Filed Oct. 27, 2004.

Kenneth M. Stern, Law Offices of Kenneth M. Stern, Woodland Hills, CA, for defendant-appellant Frank Fernandez.

Darlene M. Ricker, Malibu, CA, for defendant-appellant Roy Gavaldon.

Philip Deitch, Law Offices of Philip Deitch, Los Angeles, CA, for defendant-appellant David Gonzales–Contreras.

Cara DeVito, West Hills, CA, for defendant-appellant Dominick Gonzales.

Karyn H. Bucur, Laguna Hills, CA, for defendant-appellant Jimmy Sanchez.

Verna Wefald, Pasadena, CA, for defendant-appellant Suzanne Schoenberg–Sanchez.

Robert E. Dugdale, Janet C. Hudson, Fred A. Rowley, Jr., Assistant United States Attorneys, United States Department of Justice, Los Angeles, CA, for the plaintiff-appellee.

Before: B. FLETCHER, CANBY, and RAWLINSON, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

Appellants Frank Fernandez ("Fernandez"), Roy Gavaldon ("Gavaldon"), David Gonzales–Contreras ("Contreras"), Dominick Gonzales ("Gonzales"), Jimmy Sanchez ("Sanchez"), and Suzanne Schoenberg–Sanchez ("Schoenberg") (collectively "Appellants") were convicted on a variety of RICO and drug-trafficking charges relating to their participation in or involvement with the Mexican Mafia or "the Eme." They appeal their convictions on numerous grounds. Four of the Appellants also raise challenges to their sentences. We affirm the convictions of all six defendants; affirm the sentences of Fernandez, Gavaldon and Schoenberg; and remand for re-sentencing in the cases of Contreras, Gonzales, and Sanchez. We will, however, stay the issuance of the mandate as to all appellants except Sanchez pending the Supreme Court's resolution of the impact of *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), on the federal sentencing guidelines.

The district court had jurisdiction over these cases pursuant to 18 U.S.C. § 3231. We have jurisdiction over the consolidated appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). All Appellants filed timely notices of appeal.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In 1999, a grand jury in Los Angeles filed a twenty-nine-count First Supersed-

---

1. Throughout this opinion, we cite to the following briefs by the parties, which are available through the Westlaw database: the Appellants' Joint Opening Brief, 2002 WL 32302660; Appellants' Joint Reply Brief, 2003 WL 22849936; and the Government's Consolidated Answering Brief, 2003 WL 22706781.

ing Indictment ("the indictment"), which charged Appellants and eighteen others with a number of racketeering, conspiracy and related counts. Fernandez, Contreras, Gonzales and Sanchez were charged in count one with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[2] All Appellants were charged in count two with conspiracy to violate RICO under 18 U.S.C. § 1962(d), and in count three with conspiracy to aid and abet drug trafficking in violation of 21 U.S.C. § 846. Fernandez, Sanchez, and Schoenberg were charged in count four with conspiracy to aid and abet drug distribution within the Los Angeles County Jail ("LACJ") and other California prisons. Fernandez was charged in counts fourteen, fifteen, eighteen and twenty-one with violations of the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, 18 U.S.C. § 1959, namely, conspiracies to murder four different individuals. Sanchez was charged with two VICAR counts (fifteen and nineteen), also for conspiracy to commit murder. Finally, Gonzales was charged with one VICAR count (twenty-one) for conspiracy to commit murder, and one count (twenty-nine) of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). The jury eventually convicted Appellants on all counts, except that it found Sanchez not guilty on VICAR count nineteen and it hung on VICAR count eighteen against Fernandez.

Although the indictment had originally charged twenty-four individuals, the district court severed a number of death el-igible defendants from the non-capital defendants, the latter group including Appellants. Ultimately, eleven defendants including Appellants were tried together in the district court.[3]

*The "Eme"* [4]

Max Torvisco was an important Eme member who testified for the prosecution about the structure and activities of the organization. Torvisco testified that the Eme is the "gang of all gangs." It is an organization that wields a significant amount of control over several California prisons and jails as well as street gangs in the Los Angeles area. The Eme asserts its control through violence and intimidation.

Torvisco testified that the Eme has both full members and associates. An individual becomes a member of the organization by receiving the votes of three members and by showing loyalty to the organization through committing murder, assault, extortion or drug distribution. The Eme has a number of important rules: (1) members are not to testify against each other; (2) members are not to engage in homosexual acts; (3) members are not to engage in sexual activities with the wives or girlfriends of other members; and (4) no one, not even a member, should attempt to kill or harm a member of the Eme without the vote of three members.

Torvisco testified that the key to the Eme's power was its ability to threaten the members of smaller gangs as well as others with assault and even death if they did not comply with the Eme's demands. In

**2.** The district court dismissed the charge in count one against Contreras on the government's motion prior to trial.

**3.** In addition to Appellants, the other defendants were Robert Cervantes, Juan Garcia, Adrian Nieto, Sally Peters and Roland Ramirez. On the twentieth day of trial, Roland Ramirez pled guilty and eventually cooperat-ed with the government. The jury acquitted or hung on several of the charges against Garcia, Nieto and Peters.

**4.** We have previously described testimony regarding the Eme in *United States v. Shryock*, 342 F.3d 948, 961–62 (9th Cir.2003), *cert. denied,* —— U.S. ——, ——, 124 S.Ct. 1729, 1736, 158 L.Ed.2d 411 (2004).

particular, the Eme's power within the prison system gave it leverage even over gang members outside of prison: gang members who did not cooperate with the Eme when they were outside could be dealt with if they ever landed in jail—and many of them did. An Eme member or an associate could place an individual or even a whole gang on the "green light" list, which meant that the individual or gang was targeted for any form of assault up to and including murder. There was also a "hard candy" list, which meant that the individual or gang was targeted for death.

Torvisco testified that Eme members outside of the prison system were engaged in attempts to "organize" street gangs in various parts of the Los Angeles area. A group of Eme members or associates would meet with the members of smaller gangs and explain the Eme's "program:" the gang was to stop engaging in violence without the Eme's approval and would receive a measure of protection from the organization. The gang would also have to pay a "tax"[5] on the proceeds from their drug sales. The amount of the tax depended on the size of the gang's territory and the amount of drugs its members were selling. The Eme actually strove to minimize inter-gang violence so each gang would be more efficient in its drug-selling activities and would pay more taxes to the Eme. However, if a gang did not comply with the Eme's demands, it would be placed on the "green light" list. Torvisco testified at trial about the progress the Eme had made in organizing the gangs in East Los Angeles and the west side area of Los Angeles in the mid- to late 1990s.

*Evidence Regarding the Appellants*

Appellants Fernandez and Sanchez were identified as members of the Eme. Gavaldon, Contreras and Gonzales were identi-

fied as associates. Schoenberg was described as being "associated" with the Eme because she was married to Sanchez.

The government presented evidence that all of the appellants were involved in different aspects of the Eme's taxing of drug trafficking by street gangs. Fernandez, co-defendant Martinez and Torvisco led an effort to "organize" the street gangs in the San Fernando Valley in late 1998. Gonzales, who was Fernandez's stepson, and Contreras were responsible for collecting tax money from gangs in the Valley on behalf of Fernandez and the Eme. Gavaldon was involved in other efforts by Martinez and Torvisco to organize the gangs in the southeast area of Los Angeles, and again, to collect taxes for the Eme. Although Sanchez was incarcerated during the relevant time period, he was able to collect tax payments from gangs on the outside through the help of Torvisco. Torvisco testified that Schoenberg would deliver the payments to Sanchez during her visits to her husband in prison. In addition to testimony by Torvisco and former co-defendant Jesus Rochin, the government presented hundreds of taped conversations which corroborated the appellants' efforts to organize and tax the drug distribution of street gangs.

The government presented evidence that some of the appellants were also involved, not just in the drug taxing schemes, but in direct drug distribution themselves. Fernandez, Contreras, Gonzales and Gavaldon were shown to be engaged in drug trafficking, particularly by supplying drugs to sellers. Evidence was also presented that appellants Fernandez, Sanchez and Schoenberg had engaged in efforts to smuggle drugs into the LACJ, conduct for which they were charged in count four.

---

**5.** Torvisco testified that while the forced payments from the gangs were really "taxes" on them, he had encouraged gangs to refer to them as "contributions" or "donations" because of prior RICO prosecutions against the Eme.

Finally, the government presented evidence of conspiracies to commit murders that underlay both the RICO and VICAR counts. Some of these charges related to a conflict—Torvisco described it as a "war"—that developed between two factions of the Eme early in 1998. One faction, led by John "Stranger" Turscak[6] and his associate Jesse "Shady" Detevis, confronted another which was led by Martinez, Fernandez, Sanchez, Torvisco and others. The government presented evidence that Martinez, Fernandez and Sanchez had approved the murders of Turscak and Detevis and had discussed plans to carry them out. On Easter Sunday in 1998, Torvisco, Rochin and others actually made an unsuccessful attempt to murder Turscak. The government also presented evidence of a conspiracy to commit murder unrelated to the Turscak dispute. That conspiracy involved Fernandez, Martinez and Gonzales, who discussed killing James "Bouncer" Lopez because of Lopez's interference with the collection of drug taxes in the Valley.

The jury reached a verdict on most counts in October 2000. The jury convicted Appellants on most of the counts charged. Both Fernandez and Sanchez were sentenced to life imprisonment. The remaining appellants were sentenced to the following terms of imprisonment: Gavaldon, 262 months; Contreras, 150 months; Gonzales, 210 months; Schoenberg, 51 months. Each appellant filed a timely notice of appeal.

## DISCUSSION

### I. Challenges to the indictment

■ Except as indicated below, Appellants did not challenge the validity or sufficiency of the indictment in the district court. While challenges to the indictment can be raised at any time, we review for plain error when no objection was raised below. *United States v. Cotton*, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir.2004).

■ "Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Lillard*, 354 F.3d 850, 855 (9th Cir.2003) (internal alterations, quotation marks, and citations omitted).

### A. Counts One and Two of the indictment (RICO Counts) adequately pled a nexus to interstate commerce

■ Appellants argue that the indictment failed to allege facts supporting the required nexus to interstate commerce for counts one and two (the two RICO counts). They concede that the indictment stated that the Mexican Mafia was an enterprise, "which is engaged in, and whose activities affect, interstate and foreign commerce," but they claim that the indictment must also allege facts supporting this "conclusory pleading." 2002 WL 32302660 at *52.

■ The indictment adequately pled the interstate nexus required by the RICO statute. "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double

---

**6.** Turscak became an informant for the FBI around April 1997 and provided a great deal of information about the activities of the Eme. Some of the recordings he made of his conversations with other Eme members and associates were played at trial, although Turscak himself did not testify.

jeopardy and to be informed of the offense charged." *Rodriguez*, 360 F.3d at 958 (quoting *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir.1995)). We have previously held, in the context of Hobbs Act prosecutions, that an indictment need not set forth facts alleging how interstate commerce was affected, nor otherwise state any theory of interstate impact. *See Woodruff*, 50 F.3d at 676; *see also Rodriguez*, 360 F.3d at 958. The rationale of these cases is equally applicable to the interstate nexus requirement in the RICO statute, particularly since both Hobbs Act and RICO prosecutions require a showing of only a de minimis effect on interstate commerce to meet the respective jurisdictional elements. *See Woodruff*, 50 F.3d at 676 (Hobbs Act); *United States v. Shryock*, 342 F.3d 948, 985 (9th Cir.2003) (RICO); *see also United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir.1997).[7]

Appellants rely on *United States v. ORS, Inc.*, 997 F.2d 628 (9th Cir.1993), a case involving a criminal indictment for antitrust violations under § 1 of the Sherman Act. In *ORS*, we required the indictment to include more than "a mere allegation of a relationship to interstate trade or commerce." *Id.* at 630. Our holding in *ORS*, however, was premised on the fact that the case involved a prosecution under the Sherman Act, which requires a more significant showing of an effect on interstate commerce. *See id.* at 629 n. 4 (noting that government needed to allege that ORS's business activities had a *substantial* effect on interstate commerce). In particular, the ORS court relied on a Supreme

Court case, *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), which had clarified the jurisdictional requirements under the Sherman Act. *See ORS*, 997 F.2d at 631–32 ("[W]e are bound by the Supreme Court's statements that 'jurisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified' ....") (quoting *McLain*, 444 U.S. at 242, 100 S.Ct. 502).

■ We conclude that *ORS* represents the exception rather than the general rule on pleading requirements in the indictment. Because our precedents have previously drawn parallels between the jurisdictional requirements of the RICO statute and the Hobbs Act, *see Juvenile Male*, 118 F.3d at 1348 (relying on Hobbs Act precedent to reject challenge that RICO prosecution required showing of substantial effect on interstate commerce), we hold that the more lenient pleading requirements of Hobbs Act prosecutions should be applied to RICO cases. The indictment in this case therefore sufficiently pled a nexus to interstate commerce.

**B. Counts Three and Four of the Indictment did not need to plead a nexus to interstate commerce**

■ Appellants challenge the sufficiency of the indictment as to counts three and four (the drug conspiracy counts) because it fails to plead a nexus to interstate commerce. Although they recognize that an interstate nexus is not a statutory element of the charged offense under 21 U.S.C. §§ 841 or 846,[8] Appellants argue that un-

---

7. In the RICO context, both the First and Fifth Circuits have approved the conclusory statement of effect on interstate commerce that Appellants challenge here. *United States v. Doherty*, 867 F.2d 47, 68 (1st Cir.1989); *United States v. Martino*, 648 F.2d 367, 381 (5th Cir.1981); *United States v. Diecidue*, 603 F.2d 535, 547 (5th Cir.1979); *cf. United States v. Hooker*, 841 F.2d 1225, 1232 (4th

Cir.1988) (en banc) (finding indictment insufficient where allegation of effect on interstate commerce was entirely absent from indictment).

8. Section 846 is the provision of the Controlled Substances Act ("CSA") making unlawful a conspiracy to violate other provisions of the CSA. The indictment charged that the

der recent Supreme Court precedents on the Commerce Clause, an effect on interstate commerce is an implicit element that must be pled in the indictment.

This challenge to the indictment is without merit. We have long held that "no proof of an interstate nexus is required in order to establish jurisdiction of the subject matter" in most prosecutions under 21 U.S.C. § 841(a). *United States v. Montes–Zarate,* 552 F.2d 1330, 1331 (9th Cir.1977) (per curiam); *see also United States v. Tisor,* 96 F.3d 370, 374–75 (9th Cir.1996); *United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990). While we have recently recognized that certain classes of activities prescribed by the CSA may fall beyond the scope of Congress' Commerce Clause power, *Raich v. Ashcroft,* 352 F.3d 1222, 1229, 1233 (9th Cir.2003) (holding that the CSA may be unconstitutional as applied to the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician), *cert. granted,* —— U.S. ——, 124 S.Ct. 2909, 159 L.Ed.2d 811 (U.S. June 28, 2004) (No. 03–1454), the conduct with which the defendants are charged here bears no resemblance to the peculiar circumstances we confronted in *Raich.* Instead, the conduct charged in this case is the type of drug trafficking activity that this Court has repeatedly held to be within Congress' power to regulate. *See Raich,* 352 F.3d at 1227 (citing cases); *see also United States v. Crenshaw,* 359 F.3d 977, 986 (8th Cir.2004) ("It is well-established ... that drug trafficking and other forms of organized crime have a sufficient effect on interstate commerce to allow for regulation by Congress."). Because our precedents have rejected the

notion that an interstate nexus constitutes an element of offenses under the CSA in the drug trafficking context, the government was not required to plead such nexus in the indictment. *See Rodriguez,* 360 F.3d at 958.

## C. Counts Fourteen, Fifteen and Twenty–One (VICAR Counts) adequately pled motive and intent

■ Appellants Fernandez, Gonzales and Sanchez argue that the indictment was insufficient because it failed to plead adequately motive and intent elements of counts fourteen, fifteen and twenty-one, counts brought under 18 U.S.C. § 1959, the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute. The government points out that the indictment made a general allegation that the challenged counts, among others, were committed for the "purpose of maintaining and increasing the position of the specified defendants in the Mexican Mafia," *see* 2003 WL 22706781 at *28–29; that is, the VICAR offenses were so-called "status crimes." Appellants [9] claim that a conclusory statement of this element of the offense is insufficient, and that the indictment must plead facts upon which the element is based.

■ Appellants' arguments fail for the same reasons that their attacks on counts one and two of the indictment fail. We have held that an indictment setting forth the elements of the offense is generally sufficient. *See Woodruff,* 50 F.3d at 676 ("In the Ninth Circuit, '[t]he use of a 'bare bones' information—that is one employing the statutory language alone—is quite common and entirely permissible so long as the statute sets forth fully, directly and

---

appellants had conspired to violate 21 U.S.C. § 841(a)(1), which forbids the distribution of controlled substances.

9. Although all of the challenges to the VICAR counts are relevant only to appellants Fernandez, Gonzales and Sanchez, we will also refer to this sub-group of VICAR Appellants as "Appellants."

clearly all essential elements of the crime to be punished.' ") (quoting *United States v. Crow*, 824 F.2d 761, 762 (9th Cir.1987)). We have also held that the government needs to prove the following elements to establish a VICAR violation when proceeding under the "status crime" theory of the statute: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed a violent crime; and (4) that they acted for the purpose of promoting their position in the racketeering enterprise." *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir.1995) (citing *United States v. Vasquez–Velasco*, 15 F.3d 833, 842 (9th Cir.1994)).[10] The indictment in this case expressly alleged the required elements and is therefore sufficient.

### D. Counts Fourteen, Fifteen and Twenty–One (VICAR Counts) adequately pled the element of a nexus to interstate commerce

■ Appellants' final collective challenge to the indictment is that it failed to plead adequately an interstate nexus with regard to the VICAR counts. The jurisdictional element of 18 U.S.C. § 1959 requires that the "enterprise" in question be one "which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2); *see also Riddle*, 249 F.3d at 538. The general allegations in the indictment relating to the VICAR counts alleged that the Mexican Mafia was such an enterprise. As we explained above, an indictment is sufficient if it sets forth the elements of the charged offense. The indictment therefore adequately pled the interstate nexus as to these counts.

### E. The district court properly declined to dismiss the RICO charges against Sanchez

■ Sanchez argues that the district court erred in denying his motion to dismiss the indictment because it failed to charge him properly with conspiracy to murder Nicholas Navarro. Because Sanchez raised this challenge to the indictment in the district court, we review the district court's decision de novo. *United States v. San Juan–Cruz*, 314 F.3d 384, 387 (9th Cir.2002).

The district court properly rejected Sanchez's motion to dismiss the indictment. The indictment did not charge Sanchez with conspiracy to murder Navarro, and the government was therefore not required to set out the elements of that offense in the indictment. To the extent that the allegations regarding Navarro do not qualify as overt acts supporting the conspiracy count, they are simply surplusage. *See Bargas v. Burns*, 179 F.3d 1207, 1216 n. 6 (9th Cir.1999) ("We have repeatedly held that language that describes elements beyond what is required under statute is surplusage and need not be proved at trial.") (citation omitted). Moreover, we have previously noted that such surplusage "may be subject to a motion to strike at the instance of the [defendants] but surplusage is not fatal." *United States v. Root*, 366 F.2d 377, 381 (9th Cir.1966) (citation omitted); *see also United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir.1994) ("Allegations in the indictment that are not necessary to establish a violation of a statute are surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime."), *quoted with approval in United States v.*

---

10. Although neither *Bracy* nor *Vasquez–Velasco* referred to the element of a nexus to interstate commerce, the statute clearly requires it. *See* 18 U.S.C. § 1959(b)(2); *see also United*

*States v. Riddle*, 249 F.3d 529, 538 (6th Cir. 2001); *United States v. Gray*, 137 F.3d 765, 772 (4th Cir.1998); *United States v. Torres*, 129 F.3d 710, 717 (2d Cir.1997).

*Garcia–Paz,* 282 F.3d 1212, 1217 (9th Cir. 2002). Here, Sanchez asked the district court not just to strike the allegations, but to dismiss the indictment because of mere surplusage. The district court did not err in refusing to dismiss the indictment on that basis.

## II. Sufficiency of the evidence

 When a claim of insufficient evidence is preserved by making a motion for acquittal at the close of the evidence, we review de novo the district court's denial of the motion. *United States v. Carranza,* 289 F.3d 634, 641 (9th Cir.2002), *cert. denied,* 537 U.S. 1037, 123 S.Ct. 572, 154 L.Ed.2d 458 (2002). There is sufficient evidence to support a conviction "if, viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Odom,* 329 F.3d 1032, 1034 (9th Cir.2003) (citation omitted).

### A. Count One: Racketeering (Substantive Violations)

 Title 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt.

(emphasis added). Thus, a violation of 18 U.S.C. § 1962(c) is established by "proof of

'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Howard v. America Online Inc.,* 208 F.3d 741, 746 (9th Cir.2000) (quoting *Sedima S.P.R.L. v. Imrex Corp.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). A pattern of racketeering activity, in turn, requires at least two predicate acts, which include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in [narcotics]," that is an offense under state law "and punishable by imprisonment for more than one year." 18 U.S.C. §§ 1961(1), 1961(5).[11]

### 1. Predicate Acts (Conduct of Enterprise's Affairs)

 Fernandez, Sanchez and Gonzales argue that there was insufficient evidence to support their racketeering convictions because the only predicate acts found by the jury were the conspiracies to murder Turscak, Detevis and Lopez, which were not part of the conduct of the enterprise's affairs, but rather the acts of individuals who had personal feuds with the intended victims. As such, they assert, the conspiracies could not be substantive RICO violations.

First, contrary to Appellants' arguments, the jury specifically found that Fernandez and Sanchez had committed two predicate acts in addition to the charged murder conspiracies—the drug trafficking conspiracies in Los Angeles and in jail. Thus, even if there were insufficient evidence on the murder conspiracies, the jury found the requisite minimum of two predicate acts for these two Appellants.[12]

---

**11.** Two predicate acts are necessary, but not sufficient, to prove a violation of § 1962(c): the pattern element also requires proof of "relatedness" and "continuity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239–41, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Turner v. Cook,* 362 F.3d 1219, 1229 (9th Cir.2004). The evidence presented at trial

clearly established all the elements of a pattern of racketeering activity, and Appellants do not claim that the government did not prove relatedness or continuity.

**12.** The jury found only two racketeering acts for Gonzales, one of which was the conspiracy to murder the member of a rival faction.

Second, the argument that conspiracies to murder other members of the enterprise could not be part of the enterprise's affairs is a variation on a theme reprised throughout Appellants' briefs, the central assertion of which is that any violence between factions within an organization either proves that the group was not a RICO enterprise, or that the violence could not be considered a predicate act of the enterprise's racketeering activity. *See, e.g.*, 2002 WL 32302660 at *66, 70, 84. Similar arguments have been flatly rejected by the Second Circuit, and Appellants' argument is inconsistent with the jurisprudence of at least two other circuits.

In *United States v. Orena*, 32 F.3d 704 (2d Cir.1994), a case involving the violent 'war' between factions of the Colombo Family criminal enterprise, the Second Circuit rejected the appellant's argument that "the evidence was legally insufficient to support the RICO verdicts because no rational juror could have concluded that the Colombo Family enterprise continued to exist after July 1991, when the Orena and Persico factions commenced their conflict." *Id.* at 710. The court held that "[t]he existence of an internal dispute does not signal the end of an enterprise, particularly if the objective of, and reason for, the dispute is control of the enterprise." *Id.* (concluding that the evidence did show the existence of an ongoing enterprise, in part because "[a] surveillance recording indicated that Colombo Family members expected relationships to return to normal after the war was over") (citation omitted). *See also United States v. Brady*, 26 F.3d 282, 284–85, 288 (2d Cir.1994) (holding, in a case like *Orena* where the indictment alleged a dispute between factions for control of the enterprise, that evidence admitted at trial "was relevant to prove the existence of a war, that in turn was essential to prove the existence of the [murder] conspiracy" that was "part of the same internal struggle for control of the Fami-

ly"); *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir.1991) (rejecting a sufficiency challenge that argued "violent in-fighting somehow proves that the [enterprise] was never a cohesive, ongoing association" because "evidence clearly established that, regardless of internal disputes and membership changes, the [group's] power structure endured and its members functioned as a unit" during the relevant period); *United States v. Marino*, 277 F.3d 11, 26 (1st Cir.2002) (noting, in the course of a discussion on evidence admissibility, that two factions existed within the same overall enterprise despite a conflict between them); *United States v. Pungitore*, 910 F.2d 1084, 1100–01 (3d Cir. 1990) (holding that"[t]he evidence also shows that the appellants killed in response to a member's showing of disloyalty to the organization ... and to eliminate a faction of the enterprise's membership which threatened [one defendant's] leadership").

Moreover, in another Mexican Mafia case, we upheld the convictions of several Eme members against insufficient evidence challenges, where one count of the indictment charged five defendants with conspiracy "to kill [another member] because he was politicking against other members, threatening to kill other members, claimed to have made an individual a member without following the proper procedure, and for generally causing dissension within the organization." *Shryock*, 342 F.3d at 967. *See United States v. Shryock*, Appellants' Joint Opening Br., 2001 WL 34091052, at *170 (arguing that evidence was insufficient to establish enterprise because it showed "the existence of independent groups or members often in conflict with each other without any decision making structure"); *Shryock*, 342 F.3d at 988–89 (summarily rejecting all sufficiency challenges).

The evidence presented at trial showed that despite the violent dispute between the Martinez/Torvisco/Fernandez and Turscak/Detevis factions, members of the group still identified themselves as members or associates of the Eme; still invoked the reputation and power of the group as a whole when dealing with people outside the organization; and expected the entire organization to endure beyond the 'war,' after which relationships and methods of operation would return to normal. Despite the dispute between two factions within the organization, therefore, the evidence clearly established a single Eme enterprise.

## 2. Existence of RICO enterprise: ad hoc decision-making [13]

Appellants argue that the government did not meet its burden of proving substantive violations of the RICO statute because the evidence adduced at trial demonstrated only ad hoc decision-making. This challenge to the sufficiency of the evidence is based on the second element identified in *Sedima* as necessary to proving a violation of § 1962(c): that the racketeering activity be conducted by an "enterprise." 473 U.S. at 496, 105 S.Ct. 3275. The statutory definition of "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The indictment specifically alleged that the type of enterprise involved in this case is "an association in fact of individuals."

Under Supreme Court and Ninth Circuit precedent, establishing the existence of an associated-in-fact enterprise requires proof (1) of an ongoing organization, formal or informal, (2) which exhibits a hierarchical or consensual decision-making structure beyond that inherent in the alleged racketeering activity, and (3) in which the various associates function as a continuing unit. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Chang v. Chen*, 80 F.3d 1293, 1297, 1299–1300 (9th Cir.1996). In order for a group of individuals to qualify as an enterprise, "the [decision-making] structure should provide some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis." *Chang*, 80 F.3d at 1299 (citation and internal quotation marks omitted); *see also Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083 (9th Cir.2000) ("A group whose members collectively engage in an illegal act, in-and-of-itself, does not constitute an 'enterprise' for the purposes of RICO.").[14]

---

**13.** Since the contemplated or actual existence of a RICO enterprise is also a necessary element of a § 1962(d) conspiracy to violate § 1962(c), this challenge is also related to count two of the indictment.

**14.** Fernandez in particular asserts that the *decision-making* must occur on an ongoing basis, and that the fact that the Eme is an ongoing organization with an intricate set of rules, or a code of conduct is insufficient to establish it as an enterprise. To the extent that Appellants' arguments focus on whether the decision-making process was ad hoc or continuous, they are based on a fundamental misconception of the governing law. As the quotation from *Chang* illustrates, it is the "mechanism for controlling and directing the affairs of the group," 80 F.3d at 1299, that must exist on an ongoing basis, not the manner in which decisions are made. The point of the "not ad hoc" requirement is to distinguish between a RICO enterprise and an ordinary set of co-conspirators. *See Simon*, 208 F.3d at 1083. Consequently, the factual and legal inquiry is focused on the existence of a structure separate from the alleged enterprise, not who makes the decisions in the group. *See Chang*, 80 F.3d at 1299 ("The structure requirement, however, does not mean that every decision must be made by the same person, or that authority may not be delegated.") (citation and internal quotation marks omitted).

In their brief, Appellants support their characterization of the Eme as "an anarchy," 2002 WL 32302660 at *69, by pointing to apparent confusion about who was on the "green light" list, the process by which associates became members, the concentration of decision-making power in the hands of a few individuals, and disputes between individuals and factions within the Eme. Even if these appraisals of the evidence are accurate, they neither contradict nor undermine the jury's conclusion that the Eme was a RICO enterprise, for none is inconsistent with the existence of an associated-in-fact enterprise.

■ First, as discussed above, the mere existence of a dispute between rival factions within an organization is not dispositive of whether it qualifies as an associated-in-fact enterprise. Second, as the Second Circuit has noted, "[c]ommon sense suggests that the existence of an association-in-fact is often-times more readily proven by what it *does*, rather than by abstract analysis of its structure." *Coonan*, 938 F.2d at 1559 (emphasis in original) (internal citations and quotation marks omitted). The evidence at trial clearly established that the drug taxing and drug trafficking conspiracies were undertaken by individuals on behalf of the enterprise, and were in fact an integral part of the conduct of the Eme's affairs. Additionally, the murder conspiracies were proof of the existence of an enterprise, because the dispute was between different factions of the enterprise struggling for position within and control of the organization. *Cf. United States v. Amato*, 15 F.3d 230, 234 (2d Cir.1994) (holding, in context of criminal prosecution of members of one faction within a criminal enterprise that "[r]ivalry and dissension, however violent, do not necessarily signify dissolution of a conspiracy.").

In this case there was evidence of more than the racketeering acts and conspiracies. Wiretap evidence showed, and several witnesses testified, that the Eme was a criminal organization of long standing, with a well-defined set of rules that were enforced by violence or the threat of violence,[15] consistent procedures for recruitment and advancement, and the overall goal of controlling Latino gangs in southern California by maintaining and projecting its power both inside and outside of prison.

### 3. Sanchez: Predicate Act Not Proved Under California Law [16]

■ The indictment alleged that "[b]eginning on a date unknown to the Grand Jury and continuing at least until January 1999," several defendants including Sanchez "conspired to murder John Turscak, aka 'Stranger,' and a co-conspirator committed an overt act in furtherance of the conspiracy, in violation of California Penal Code Sections 182 and 187." Sanchez claims that there was insufficient evidence at trial to convict him of the conspiracy to murder John Turscak because under California law, he committed no crime: neither he nor Martinez committed an overt act between November 1998 (the date that he joined the conspiracy) and February 1999. His arguments in support of this claim fail,

---

**15.** In this context, witness testimony and wiretap transcripts showed that the "green light" list was used to enforce the rules of the organization, and to force gang members to pay their taxes to the Mexican Mafia—both clearly objectives of the enterprise as a whole, not merely individuals within the organization.

**16.** Sanchez makes the same argument about his conviction on count fifteen. *See* Sanchez Opening Br. at 8. The discussion in this section applies equally to his conviction on that count, as both are based on the same underlying conduct, the conspiracy to murder Turscak.

because it is clear under California conspiracy law that he bears responsibility for the actions of his co-conspirators.

■ Under California law, "[a] conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit" a specified crime, "with the further specific intent to commit that crime ..., followed by an overt act committed in this state by one (or more) of the parties for the purpose of accomplishing the object of the agreement." CAL. JURY INSTRUCTIONS, CRIMINAL (7th ed.2004) 6.10; *see also People v. Heredia*, 257 Cal.App.2d 862, 65 Cal.Rptr. 402, 404 (1968). It is clear from the record that Sanchez agreed with others to kill Turscak or to have him killed, and his arguments focus on the lack of evidence of an overt act after he joined the conspiracy.

■ California law does not require that each defendant charged with conspiracy have committed an overt act; it is sufficient that at least one co-conspirator have committed an overt act in furtherance of the conspiracy. *See* CAL. PENAL CODE § 184 (overt act must be committed "by one or more of the parties to such agreement"); *People v. Russo*, 25 Cal.4th 1124, 1135, 108 Cal.Rptr.2d 436, 25 P.3d 641 (2001) ("Moreover, any one of the conspirators, and not necessarily the charged defendant, may commit the overt act to consummate the conspiracy."). It is unclear, however, whether the overt act must be committed while the defendant is a part of the conspiracy in order for it to be used

against him. *Compare* CAL. JURY INSTRUCTIONS, CRIMINAL 6.10 ("It is not necessary to the guilt of any particular defendant that he personally committed an overt act, if he was one of the conspirators when the alleged overt act was committed.") (alternative pronouns omitted), with 1 WITKIN & EPSTEIN, CALIFORNIA CRIMINAL LAW (3d ed. 2000) Elements § 95 ("[O]ne who joins with the existing conspirators in the criminal plan does not create a new conspiracy but becomes a member of the existing conspiracy. Hence, an overt act committed prior to the new member joining will be just as effective against him or her as against the prior parties....").[17]

Even if the overt act must have been committed while Sanchez was a member of the conspiracy, his contention that no such act was committed between November 1998 and February 1999 is not supported by the evidence. In December 1998, Martinez followed Turscak's wife home on the freeway in order to determine where the Turscaks lived, so that Turscak could be killed after he was released from prison. This overt act, committed after it was clear that Sanchez had joined the conspiracy, is the last necessary element that establishes Sanchez was a member of a conspiracy to murder Turscak. Both his challenge to his conviction on count fifteen (which alleged that he participated in this conspiracy for a particular purpose) and his challenge to count one (which included this conspiracy as one of the predicate acts in which Sanchez participated) fail.

---

**17.** *People v. Van Houten*, 113 Cal.App.3d 280, 170 Cal.Rptr. 189 (1980), upon which Sanchez relies in his reply brief, does not help to resolve this contradiction. That case cites a different California jury instruction to support its holding that a defendant "could not have been criminally responsible for acts of co-conspirators committed before she joined the conspiracy." *Id.* at 194 (citations omitted.) Even Witkin, however, notes that a defendant is not liable for the substantive offenses committed by his coconspirators prior to his joining the conspiracy. *See* Witkin & Epstein § 96.

## B. Counts Two, Three and Four: RICO Conspiracy, Drug 'Taxing' Conspiracy, Drug Trafficking in Jail Conspiracy

### 1. Existence of single interdependent conspiracy in each count

■ Whether a single conspiracy has been proved is a question of the sufficiency of the evidence. *United States v. Duran*, 189 F.3d 1071, 1078 (9th Cir.1999) (citing *United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir.1984)). The test for determining whether a single conspiracy, rather than multiple smaller conspiracies, has been proved was outlined most recently in *Duran*:

A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation. Typically, the inference of an overall agreement is drawn from proof of a single objective ... or from proof that the key participants and the method of operation remained constant throughout the conspiracy. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the co-conspirators knew of each other's partic-

ipation or actually benefitted from the activities of his coconspirators.

189 F.3d at 1080 (internal citations, alterations, and quotation marks omitted); *see also United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir.1984) (holding that "[t]he relevant factors include the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals").

■ Appellants assert that instead of the single conspiracies charged in counts two, three and four, the evidence at trial proved only the existence of multiple smaller conspiracies.[18] With regard to count three, which alleged a drug trafficking and taxing conspiracy in the greater Los Angeles area, Appellants concede that "these many conspiracies often involved some of the same people," but assert that "they were separate territorial activities, the success of each of which was not dependent upon the success of any others." 2002 WL 32302660 at *75. With regard to count four, Appellants assert that the prosecution's evidence showed only the existence of multiple smaller conspiracies to sell drugs in county jail and state prison.

■ This challenge focuses on the problem of variance between the indictment and the proof at trial: if the indictment alleges a single conspiracy, but the evidence at trial establishes only that there

---

**18.** Appellants' multiple conspiracies arguments are focused on counts three and four. They also claim, however, that the evidence underlying their convictions on count two was simply a conglomeration of the evidence presented on counts three and four. This argument is flatly contradicted by the prosecution's case, which involved evidence of numerous predicate conspiracies and overt acts unrelated to the drug taxing and trafficking conspiracies charged in counts three and four.

Even if Appellants had raised an accurate multiple conspiracies challenge to count two,

it would be unavailing. The several conspiracies that were predicate acts for the substantive RICO violations of § 1962(c) were also evidence of the overall § 1962(d) conspiracy to violate RICO. What matters for a sufficiency of the evidence inquiry is that there was adequate proof of an overall conspiracy to participate, directly or indirectly, in the conduct of the Eme's affairs through a pattern of racketeering activity. In this case, the pattern included predicate acts that were themselves constitutive conspiracies.

were multiple unrelated conspiracies, there is insufficient evidence to support the conviction on the crime charged, and the affected conviction must be reversed. *See United States v. Antonakeas,* 255 F.3d 714, 723 (9th Cir.2001) (discussing variance theory based on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In count three, the indictment alleged that all six appellants participated in a conspiracy to sell drugs on the street and demand taxes from "narcotics traffickers and street gangs ... in order to continue their narcotics trafficking activities free of interference from the Mexican Mafia," and that "failure to pay the taxes would result in retribution, both on the streets and in penal institutions, by the Mexican Mafia."

While Appellants are correct that there were different sub-groups operating in different areas of Los Angeles, the method of operation remained constant, and included the demand for payment of tributes or taxes, the promise of protection and support in exchange for payment, and the threat of or use of violence if payment was not made. Moreover, the operation of different Eme groups in different areas of town does not contradict the existence of a single conspiracy, as the jury could reasonably have concluded (especially given the evidence presented to this effect) that the actions of the enterprise's members were co-ordinated, so as to ensure that no two groups were taxing in the same area. Last, even Appellants' description of the conspiracies reveals the common participation of key senior Eme members, another factor supporting the conclusion of a single conspiracy in which senior members of the enterprise co-ordinated and managed the operations of their subordinates. *See* 2002 WL 32302660 at *76–79 (common participation of Martinez, Torvisco and Fernandez with various associates).

In count four, the indictment alleged that Fernandez, Sanchez and Schoenberg conspired to smuggle narcotics "into the Los Angeles County Jail and other California penal facilities" where one-third would be sent to Eme members, and that "a portion of the profits from the sale of [these] narcotics" would be sent to these defendants and other Eme members. Here again, the evidence adduced at trial showed consistent methods for smuggling drugs into jail. More importantly, there was an established system for the distribution and sale of drugs once inside a jail, which involved the standard tribute given to Eme members, the advertisement of drugs for sale, the method of payment, and the threat of violence for nonpayment.

Appellants' arguments in support of a theory of multiple conspiracies are meritless. First, although they concede that Ramirez testified that "some of the drugs belonged to the Mexican Mafia," and that he had agreed to "sell drugs within state prison for Mr. Fernandez, *as would others associated with the Mexican Mafia,*" 2002 WL 32302660 at *79, 80 (emphasis added), they maintain that "no evidence ... was presented to suggest that any other appellant knew about these private schemes, much less took part in the conspiracy to sell these drugs." Even if true, this fact does not mean that there was not a single overall conspiracy to sell drugs in penal facilities. *See Bibbero,* 749 F.2d at 587 (holding that "[a] single conspiracy may involve several subagreements or subgroups of conspirators"). Second, the assertion that "each ... person's drug sales ... constitute[s] a different conspiracy" is directly contradicted by the evidence of a generalized, coherent and consistent scheme for the reception and distribution of narcotics and division of profits from sale.

For each of the conspiracies alleged in counts three and four, the evidence showed not only that members and associates knew of the activities of others within the group, but that the entire operation of the drug taxing and jail distribution schemes was heavily dependent on the reputation and strength of the Mexican Mafia as an entire organization, and that each scheme was intended to benefit all members and associates within the enterprise. The evidence at trial established a single interdependent conspiracy for each of counts three and four. *See Kotteakos,* 328 U.S. at 773, 66 S.Ct. 1239 (distinguishing between many co-conspirators, who "invite mass trial by their conduct," and "those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group").

**2. Schoenberg's challenge to Count Two: no conspiracy because no agreement to direct Eme's affairs**

■ Relying on the governing case in this circuit on RICO conspiracy, *Neibel v. Trans World Assur. Co.,* 108 F.3d 1123 (9th Cir.1997), Schoenberg asserts that she cannot be convicted for conspiracy to violate RICO if she did not agree to direct the enterprise's affairs. We conclude that *Neibel* is no longer good law because it is inconsistent with subsequent Supreme Court precedent. Under the appropriate test outlined in *Salinas v. United States,* 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the evidence presented at trial was sufficient to support Schoenberg's conviction under § 1962(d) for conspiracy to violate § 1962(c).

Title 18 U.S.C. § 1962(d) provides, in relevant part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." In *Reves v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that liability under § 1962(c), for substantive violations of the RICO statute, was limited to "those who participate in the operation or management of an enterprise through a pattern of racketeering activity." After reasoning that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs," *id.* at 179, 113 S.Ct. 1163 (quoting § 1962(c)), the Court cautioned that its adoption of the 'operation or management' test did not mean that liability was limited to upper management. "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. 1163; *see also id.* at 179, 113 S.Ct. 1163 ("Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . but *some* part in directing the enterprise's affairs is required.").

In *Neibel,* we adopted the reasoning of the Third Circuit in *United States v. Antar,* 53 F.3d 568, 581 (3d Cir.1995), in which that court extended *Reves'* § 1962(c) holding to conspiracy convictions under § 1962(d), and concluded:

> [W]e believe that a distinction can be drawn between, on the one hand, conspiring *to* operate or manage an enterprise, and, on the other, conspiring *with* someone who is operating or managing the enterprise. Liability under section 1962(d) would be permissible under the first scenario, but, without more, not under the second.

*Antar,* 53 F.3d at 581 (emphasis in original) (quoted in *Neibel,* 108 F.3d at 1128). In applying this approach to the insufficient evidence challenge before it, the *Neibel* panel concluded: "We agree with the Third Circuit that to uphold the jury's verdict in this case after *Reves,* there must

have been substantial evidence that [the defendant] *agreed* to have *some* part in directing [the enterprise's] affairs." 108 F.3d at 1128 (internal quotation marks omitted) (emphasis in original).[19]

In *Salinas*, a unanimous decision handed down almost nine months after *Neibel*, the Supreme Court held that a sheriff's deputy could be convicted of conspiracy under § 1962(d) for his role in a scheme that violated the federal bribery statute even though he neither committed nor agreed to commit the predicate acts that are required for a substantive violation of § 1962(c). After outlining "certain well-established principles" of the law on conspiracies that were equally applicable to RICO conspiracies, 522 U.S. at 63–65, 118 S.Ct. 469, the Court held that "[t]he evidence showed that [the sheriff] committed at least two acts of racketeering activity when he accepted numerous bribes and that [the deputy] *knew about and agreed to facilitate the scheme.* This is sufficient to support a conviction under § 1962(d)." *Id.* at 66, 118 S.Ct. 469 (emphasis added). The *Salinas* court did not refer to its earlier *Reves* opinion and its adoption of the operation or management test required to sustain a conviction under § 1962(c), nor did it mention the *Antar–Neibel* approach, which appeared to require more than knowledge and an agreement to facilitate the enterprise's activities for a § 1962(d) conviction. The Court did note, however, that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65, 118 S.Ct. 469.

■ In response, over three years later, the Third Circuit stated unequivocally:

[W]e hold that any reading of *United States v. Antar* to the effect that conspiracy liability under section 1962(d) extends only to those who have conspired personally to operate or manage the corrupt enterprise, or otherwise suggesting that conspiracy liability is limited to those also liable, on successful completion of the scheme, for a substantive violation under section 1962(c), is inconsistent with the broad application of general conspiracy law to section 1962(d) as set forth in *Salinas*.

*Smith v. Berg*, 247 F.3d 532, 534 (3d Cir. 2001) (internal citations omitted). The *Smith* panel found that *Antar's* "novel distinction," upon which *Neibel* had relied, "was unnecessary to our holding, as [the opinion] concluded, in effect, that the defendant met either standard." *Id.* at 536. The Third Circuit read the Supreme Court's decision in *Salinas*, upholding the conspiracy conviction of a defendant who had been acquitted of substantive RICO violations, as a rejection of the view that a violation of § 1962(c) was a prerequisite for a violation of § 1962(d). *Id.* at 537. Although it is unclear whether the *Smith*

---

19. *But cf. Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774–75 (9th Cir. 2002) (holding "[i]t is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy" without mentioning *Neibel's* limitations on who may be held liable for RICO conspiracy, which posit that conspiracy liability is dependent on potential substantive liability if the scheme were successfully completed).

Although not explicitly labeled as such, the *Neibel* approach has been applied by at least one other Ninth Circuit panel, in another case involving the Mexican Mafia. *Shryock*, 342 F.3d 948, 985–86 (9th Cir.2003) (holding that jury instruction improperly defined element of RICO conspiracy charge by not using language consistent with the operation or management test, but concluding that the error was harmless).

panel was dismissing *Antar's* restrictions as mere dicta, or concluding that any binding statement of the law had been vitiated by *Salinas, compare id.* at 536, *with id.* at 537, its holding on § 1962(d)'s requirements is straightforward: "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." *Id.* at 538. After *Smith,* ours was the only circuit in which the *Reves* operation or management test was applied to RICO conspiracies. *See id.* at 536 n. 8.

▅▅▅ We now agree with the Third Circuit that the rationale underlying its distinction in *Antar,* and our holding in *Neibel,* is no longer valid after the Supreme Court's opinion in *Salinas.* Accordingly, this case presents a situation similar to *Miller v. Gammie,* in which we held that "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled." 335 F.3d 889, 893 (9th Cir.2003) (en banc). We adopt the Third Circuit's *Smith* test, which retains *Reves'* operation or management test in its definition of the underlying substantive § 1962(c) violation, but removes any requirement that the defendant have actually conspired to operate or manage the enterprise herself. Under this test, a defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed that she "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *Smith,* 247 F.3d at 538.

Schoenberg's role in the activities of the Eme enterprise is enough to justify her § 1962(d) conspiracy conviction. *See Howard,* 208 F.3d at 751 (holding that, in addition to the general conspiracy principles mentioned in *Salinas,* "[a] defendant must also have been 'aware of the essential nature and scope of the enterprise and intended to participate in it.' ") (quoting *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993)). The evidence at trial showed that Schoenberg collected protection money for the Eme on behalf of her husband, an Eme member; passed messages to her husband and other Eme members in order to facilitate communication between murder conspirators; smuggled drugs into prison; and accepted payment for drugs sold on the street. We affirm her conviction for conspiracy to violate RICO.[20]

### 3. Sanchez's challenge to Count Two: general insufficiency

▅▅▅ Like his arguments in relation to count one, Sanchez's challenge to his conviction of RICO conspiracy in count two also focuses on whether or not certain overt acts were committed. The government construes these arguments as assertions that Sanchez must have committed some overt act in order to be convicted of conspiracy, and correctly argues that the prosecution was not required to prove that he committed any such act with respect to count two. *See* 2003 WL 22706781 at *72–73 (citing *Salinas,* 522 U.S. at 64–65, 118 S.Ct. 469).

▅▅▅ To the extent, however, that Sanchez's arguments are simply directed toward the sufficiency of the evidence that he even conspired to violate RICO, they are belied by the evidence adduced at trial, which established Sanchez's role in the

---

**20.** Schoenberg's challenge to count three is essentially a reprisal of the joint opening brief's multiple conspiracies argument. For the reasons discussed above, we reject this challenge.

enterprise's activities, including collecting drug taxes, drug distribution in jail, and the conspiracy to murder Turscak. Moreover, his arguments are inconsistent with governing RICO case law, under which a defendant convicted of a substantive violation of § 1962(c) is also guilty of a § 1962(d) conspiracy to violate RICO, as long as the separate elements of the crime of conspiracy are met. *See, e.g., United States v. Starrett,* 55 F.3d 1525, 1549 (11th Cir.1995) (holding that because evidence was sufficient to support defendants' § 1962(c) convictions, and jury could infer from evidence that defendants each manifested an agreement to participate in enterprise's affairs, evidence was sufficient to support defendants' § 1962(d) convictions for RICO conspiracy); *United States v. Frega,* 179 F.3d 793, 808–10 (9th Cir.1999) (holding that judge erred in not explaining to jury that it could consider predicate acts listed in relation to substantive RICO count when deciding whether defendants had also conspired to violate RICO); *United States v. Marino,* 277 F.3d 11, 18 (1st Cir.2002) (noting, in case of defendants convicted under §§ 1962(c) and (d) that, although the two are legally distinct crimes, "[t]he substantive RICO and RICO conspiracy counts required the defendants to be found guilty of at least two racketeering acts or predicate acts."); *United States v. Bennett,* 44 F.3d 1364, 1374 (8th Cir.1995) (holding that in addition to the elements of the substantive violation, "[a] RICO conspiracy requires proof of the additional element of an agreement").

### 4. Gavaldon's challenge to Count Two: Not an Eme "member"

█ Roy Gavaldon argues that there was insufficient evidence at trial to support his conviction for participation in the racketeering conspiracy because he was not a member of the enterprise. Gavaldon's arguments confuse the factual particularities of the enterprise in this case with the legal standards for participation in a racketeering enterprise: the fact that he was not a "member" of the Eme, i.e., did not have decision making authority within the group, did not mean that he did not conspire to participate in the conduct or operation of the enterprise. As an Eme associate who was ordered to handle the southeast Los Angeles gangs, and to assault someone who had "burned" Eme members, and who collected payments on behalf of Eme members, Gavaldon shared the liability of other individuals within the enterprise, even if he was not a leader within the group. *See Salinas,* 522 U.S. at 65, 118 S.Ct. 469; *cf. United States v. Brady,* 26 F.3d 282, 289–90 (2d Cir.1994) (rejecting as "semantic and ... entirely without merit" argument that VICAR murder conspiracy conviction should be reversed because defendant was "merely an associate" and therefore "had no position in the Family" and noting that witness testimony and the indictment "make it clear that associates are considered to be members of the enterprise, even though they are not 'made members' of the Family").[21]

### C. Counts Fourteen, Fifteen and Twenty–One: VICAR Murder Conspiracies

The federal statute on violent crimes in aid of racketeering activity ("VICAR statute") provides in relevant part:

> Whoever, [1] as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise

---

**21.** Gavaldon's argument on count three, that there was insufficient evidence to convict him of participation in the drug taxing conspiracy, is directly contradicted by the evidence presented at trial.

engaged in racketeering activity, *or* [2] *for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity,* murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts *or conspires so to do,* shall be punished[.]

18 U.S.C. § 1959(a) (emphasis added).

The statute clearly contemplates two alternative theories of motive for the commission of VICAR offenses: either the defendant received something of pecuniary value from the racketeering enterprise to commit the crime ("quid pro quo crime" or "murder for hire"); or the crime was committed to achieve, maintain or increase the defendant's status in the enterprise ("status crime"). It is the second motive that was alleged by the government in this case.

 Fernandez, Sanchez and Gonzales raise five challenges to the evidence supporting their VICAR convictions: (1) no substantial evidence was adduced to prove the commission of crimes for quid pro quo consideration; (2) a status crime must be committed to "enhance one's position in the eyes of the organization itself, not just ... in the eyes of individuals associated with, or factions of, the organization," 2002 WL 32302660 at *84; (3) the motive suggested by the government was "nonsensical" because "[i]t would not enhance, maintain or establish any of the appellants' positions within the Mexican Mafia to eliminate the very people they would allegedly be trying to impress by their actions," *id.* at *85; (4) the government failed to prove that the crimes, even if alleged to be status crimes, were committed on behalf of the enterprise, not simply to benefit individuals within the enterprise, *id.* at *85, 89–92;

and (5) insufficient evidence that the crimes alleged were committed for the motives ascribed to the defendants. *Id.* at *86–87. All five claims are meritless.

First, the indictment clearly alleged that "the defendants specified below committed the offenses specified below, each such offense having been committed for the purpose of maintaining and increasing the position of the specified defendants in the Mexican Mafia." The government's theory of the case—from the terms of the indictment to the evidence presented at trial—was that the participants in the VICAR murder conspiracies intended to commit status crimes, not quid pro quo crimes. No evidence was presented to support an allegation that was never made by the prosecution. Appellants' first challenge thus provides no basis for reversing the VICAR convictions.

 Appellants cite no case (nor can one be found) to support their second contention, that the motive for committing a status crime must be to enhance one's position in the eyes of the enterprise itself, not individuals or factions within the enterprise. *See, e.g., United States v. Tse,* 135 F.3d 200, 206 (1st Cir.1998) (adopting the position of the Second and Fourth Circuits in holding that, for VICAR status crime conviction, a jury is required to find only that defendant's general motive was to maintain his position in enterprise and that he acted to further his membership in enterprise, and mentioning no other requirements) (citing *United States v. Fiel,* 35 F.3d 997, 1004–05 (4th Cir.1994); *United States v. Concepcion,* 983 F.2d 369, 380 (2d Cir.1992)). Moreover, Appellants' distinction between the individuals and "the enterprise itself" appears to mirror their general confusion about the type of RICO enterprise involved in this case. Where the indictment alleges, and the government sets out to prove, the existence of an

associated-in-fact enterprise, it is clear that the role of individuals within that enterprise is particularly important. Enhancing one's status in the eyes of certain individuals, especially if they are in leadership roles within the group, could very well lead to promotion within the enterprise.

■ Appellants' third argument—that the alleged motive of a status crime is nonsensical because the intended victims were themselves members of the enterprise—is a repackaged version of the assertion that an enterprise cannot exist where different factions fight for control. It is equally meritless. Conspiring to kill members of a rival faction within the enterprise is perfectly consistent with an attempt to maintain or increase one's position in the group, especially when the intended victims were not leaders in the group and the conspiracy takes place in the context of a power struggle within the group.

Contrary to the Appellants' assertions in their fourth challenge to their VICAR convictions, the government need not prove that the status-crime was committed on behalf of the organization itself, rather than to benefit the individual conspirators. That requirement is relevant only to allegations of quid pro quo crimes. *Compare Vasquez–Velasco,* 15 F.3d at 842 (no requirement that status crime be on behalf of organization itself), *and Concepcion,* 983 F.2d at 381 (same, and referring to status crime motivation as "self-promotion"), *with United States v. Andino,* 101 F.Supp.2d 171, 175 (S.D.N.Y.2000) ("To convict a defendant under *the 'murder for hire' provision* of § 1959(a), the government must prove [1] that the defendant was paid or promised payment for attempting or conspiring to commit murder[; and] [2] that the payment or promise of payment was received from an enterprise engaged in racketeering activity.... Put differently, in order for the payment to have been

received from the enterprise, Castro must have been acting *as an agent of the enterprise, not in his personal capacity,* when he made the payment to Andino.") (emphasis added). Appellants' reliance on *Andino,* a case involving quid pro quo offenses, is misplaced.

■ Last, in their fifth claim, Appellants challenge the evidence supporting the individual motives ascribed to them in their murder conspiracy convictions. Relying on the leading Second Circuit case on status crime VICAR convictions, they assert that there was no evidence that the enterprise expected Gonzales, Sanchez and Fernandez to commit the crimes; or that they knew the enterprise expected them to commit these crimes; or that the commission of these crimes would actually maintain or enhance their positions within the Eme. *See Concepcion,* 983 F.2d at 381 ("We consider the motive requirement satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.").

For all the reasons explored above—the importance of individuals within an associated-in-fact enterprise, the violent methods used to enforce the Eme's strict rules, and the fact that maintenance of an individual's position within an organization that contains two rival factions can hinge on eliminating threats to one's power and prestige within the group—we hold that a rational trier of fact could have found that these defendants conspired to murder their rivals in order to secure their own positions within the Eme and maintain its overall cohesion as a single organization. We reject Appellants' challenge to their VICAR convictions.

## III. Motions to suppress wiretap evidence and requests for an evidentiary hearing

### A. Probable cause and necessity to support the wiretaps

 Appellants argue that the district court erred in failing to suppress evidence gathered by the government through the wiretapping of the home phone lines of Fernandez ("Line 6") and co-defendant Martinez ("Line 7"). Appellants claim that the wiretap applications contained false and misleading statements and omitted important information, so that probable cause would not have been established if the applications had been prepared properly. Appellants argue that, at a minimum, they made a sufficient showing of misrepresentations in the wiretap applications to require the district court to conduct a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Appellants further claim that the wiretap applications for the relevant phone lines failed to establish the "necessity" requirement set out in 18 U.S.C. § 2518(1)(c).

 "A district court's denial of a motion to suppress evidence is reviewed de novo and underlying factual issues are reviewed for clear error." *United States v. Lynch,* 367 F.3d 1148, 1159 (9th Cir.2004) (citation omitted). "We review de novo whether a full and complete statement of the facts was submitted in compliance with 18 U.S.C. § 2518(*l*)". *United States v. Blackmon,* 273 F.3d 1204, 1207 (9th Cir. 2001) (citation omitted). "The ultimate question of whether a false statement or omission is necessary to a finding of probable cause is a mixed question of law and fact" reviewed de novo. *United States v. Tham,* 960 F.2d 1391, 1395 (9th Cir.1991). If a full and complete statement of facts was submitted, the court reviews the issuing judge's decision that the wiretap was

necessary for an abuse of discretion. *Blackmon,* 273 F.3d at 1207.

Appellants filed or joined a number of separate motions at the district court challenging the validity of the wiretap applications for Lines 6 and 7, and for a cell phone used by Detevis ("Line 1") to the extent that it provided the basis for the applications for Lines 6 and 7. The district court denied all the motions.

The government applications for the three lines in question were supported by affidavits from FBI Special Agent David Olsen ("Olsen affidavits"). Although much of the language used in the Olsen affidavit for Line 1 is repeated verbatim in the later affidavits, the latter do build on the information developed through the earlier wiretaps.

### 1. Standing and lack of objection

The government argues that Appellants lack standing to challenge the validity of the wiretap as to Line 1 because none of them was targeted under that line. Even assuming this is the case, any meritorious challenges raised by Appellants would apply equally to the wiretap applications for Lines 6 and 7, and the government does not appear to challenge Appellants' standing regarding those lines. The government also argues that Contreras did not join in any of the motions to suppress the evidence gathered through wiretaps. The district court record, however, reflects that Contreras did join in co-defendants Mercado and Nieto's motion regarding Line 1 and Martinez's motion regarding Lines 6 and 7. We therefore consider the merits of the claims as to all appellants.

### 2. Material misstatements or omissions and probable cause

 Appellants argue that the facts omitted from the Olsen affidavits, if considered with the rest of the information provided, would not establish probable

cause for the wiretaps. In order to issue a wiretap order, the district court must find probable cause to believe "(1) that an individual is committing, has committed, or is about to commit specified offenses, ... (2) that communications relevant to that offense will be intercepted through the wiretap, and (3) that the individual who is the focus of the wiretap investigation will use the tapped phone." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir.1995) (internal citations omitted). We conclude that none of the alleged omissions, if they existed at all, undermine the district court's finding of probable cause.

Appellants first claim that the Olsen affidavit for Line 6 failed to mention that Fernandez was a federal fugitive and that the government had never attempted to arrest him. The government appears to concede that this fact was omitted from the Olsen affidavits, but argues that the fact was not material because, if anything, it made it more likely that Fernandez was engaged in criminal behavior. The district court agreed, noting that Fernandez's fugitive status would have increased the showing of probable cause, not diminished it. We agree with the district court's determination as it relates to probable cause. However, the district court's analysis does not defeat Appellants' arguments that the omission was material to the necessity requirement. We address those arguments in the next section.

Appellants' second claim is that the Olsen affidavits failed to mention that the person Confidential Witness # 2 ("CW# 2") claimed was Fernandez's associate was, in fact, CW# 2's associate. At the district court, Appellants claimed that the associate was an individual named Debra Wood Farris or "Deb," and provided evidence that this person was in fact CW# 2's—rather than Fernandez's—associate. The government, however, submitted the affidavit of FBI Special Agent Franklin Davis, who stated that the individual referred to in the affidavit was co-defendant Robert Cervantes, who was in fact Fernandez's associate. Appellants provided no evidence to rebut this assertion, and the district court agreed with the government that the reference was to Cervantes. The Olsen affidavits were therefore neither false nor misleading on this point. Appellants have pointed to nothing in the record that would lead us to conclude that the district court's finding was clearly erroneous.

Finally, Appellants argue that the Olsen affidavits failed to mention that "CW# 2 personally facilitated the purchase of drugs to be taken into the Los Angeles County Jail." 2002 WL 32302660 at *104. As the district court pointed out, however, the Olsen affidavits made specific reference to the fact that CW# 2 had facilitated such a drug deal. The record therefore fully supports the district court's finding that the Olsen affidavits contained "no material misrepresentations or omissions with respect to CW# 2's drug use and drug dealing."

In sum, none of the omissions alleged by the appellants undermines the district court's finding that probable cause existed to approve the wiretaps.

### 3. The necessity requirement

■ Appellants claim that the wiretap applications failed to make the required showing of necessity. In order to obtain a court-approved wiretap, the government must submit an application that includes, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Our court has adopted

a 'common sense approach' in which the reviewing court uses a standard of rea-

sonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success. Though the wiretap should not ordinarily be the initial step in the investigation, ... law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap.

*United States v. Canales Gomez,* 358 F.3d 1221, 1225–26 (9th Cir.2004) (internal quotation marks and citations omitted).

Appellants' arguments regarding the necessity requirement lack merit. Appellants first claim that the government's use of two confidential informants, CW# 1— now known to be John Turscak—and CW# 2, obviated the need for a wiretap because they were able to provide significant information regarding the activities of the Eme. We have recently rejected similar arguments under virtually identical circumstances. In *Shryock,* 342 F.3d at 976, the government had access to seven cooperating individuals whom we described as providing "a wealth of information and evidence" in an investigation of the Eme. We found that even with access to these informants, the government had been able to meet the necessity requirement:

> [T]he Mexican Mafia is a broad-based organization with several hundred members and an unknown number of associates. Several informants—including former members of the Mexican Mafia ...—could not possibly reveal the full nature and extent of the enterprise and its countless, and at times disjointed, criminal tentacles.

*Id.* (citations omitted). Our holding in *Shryock* is controlling here and defeats Appellants' arguments regarding the informants. *See also Canales Gomez,* 358 F.3d at 1226 ("The government need not show

that informants would be useless in order to secure a court-authorized wiretap."); *United States v. McGuire,* 307 F.3d 1192, 1197 (9th Cir.2002) (holding that the government had established necessity for wiretaps despite its use of three cooperating witnesses because "those witnesses were able to give agents only limited information, not including the names of all members of the conspiracy").

Appellants also argue that the fact that the Olsen affidavits failed to disclose Fernandez's status as a federal fugitive undermines the district court's finding of necessity. We conclude, however, that this omission was not material because the inclusion of the omitted information would not have affected the district court's determination of necessity. *See Meling,* 47 F.3d at 1553. The Olsen affidavits pointed out that interviews and grand jury investigations of Mexican Mafia members were risky investigative techniques because they would alert the targets of the ongoing investigation. The fact that the government had the authority to arrest Fernandez and question him about his activities did not mean that it would have been able to obtain the information it gathered through the wiretaps. *See Canales Gomez,* 358 F.3d at 1226 ("This court [has] consistently upheld findings of necessity where traditional investigative techniques lead only to the apprehension and prosecution of the main conspirators, but not to the apprehension and prosecution of ... other satellite conspirators.") (quoting *McGuire,* 307 F.3d at 1198). While the information regarding Fernandez's fugitive status was relevant to the necessity inquiry, the district court could reasonably have found that the wiretaps were necessary even in the presence of that information. The omission was therefore not material to the necessity inquiry.[22]

---

**22.** Appellants argue also that the Olsen affida- vits failed to note that Gonzales was subject to

Appellants' most compelling argument is that the generalized averments made in the Olsen affidavits as to why normal investigative techniques would not work in this case were not sufficient to establish necessity. Some aspects of the Olsen affidavits are indeed problematic in this regard, especially in light of our precedent in *Blackmon,* 273 F.3d at 1210, where we concluded wiretap applications that included generalized statements as to why normal investigative techniques would be unsuccessful were insufficient. We noted that the "boilerplate assertions" made in the affidavits at issue in that case were "unsupported by specific facts relevant to the particular circumstances of [the] case and would be true of most if not all narcotics investigations." *Id.* Portions of the Olsen affidavits suffer from the same flaws emphasized in *Blackmon:* they include statements that are "nothing more than a description of the inherent limitations" of particular investigative techniques. *Id.*[23]

In the end, however, we cannot conclude that the district court abused its discretion in finding that the Olsen affidavits satisfied the necessity requirement set out in 18 U.S.C. § 2518(1)(c). This case is distin-

guishable from *Blackmon* because our holding in that case was premised on a finding that the affidavits supporting the wiretap applications were plagued by material misrepresentations and omissions. *See Blackmon,* 273 F.3d at 1209–10; *see also Canales Gomez,* 358 F.3d at 1225 (declining to apply *Blackmon* because no material omissions or misstatements were alleged in that case). As we explained above, Appellants have not shown that the Olsen affidavits suffered from material misrepresentations or omissions. We therefore affirm the district court's decision not to suppress the wiretap evidence in this case.

## B. The district court's failure to conduct a Franks hearing

Appellants argue that the district court erred in failing to conduct a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We review the district court's denial of a *Franks* hearing de novo, but review the underlying factual findings of the district court regarding materiality under the clearly erroneous standard. *United States*

parole searches that could have yielded important information. This omission, however, was not material to the necessity requirement. As the government points out, we had made clear long before the events at issue here that *probation* searches could not be conducted as a subterfuge for a criminal investigation. *See United States v. Richardson,* 849 F.2d 439, 441 (9th Cir.1988), *overruled by United States v. Knights,* 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Law enforcement officials could properly have doubted, therefore, that a *parole* search of Gonzales's residence would have been proper under similar circumstances.

Appellants make also a half-hearted argument that the Olsen affidavits failed to address why the government could not rely on intercepts of telephone conversations by Eme members in California prisons. As the appellants them-

selves recognize, however, at the time of the investigation of this case, California decisional law did not allow monitoring of telephone conversations by inmates for purposes of investigating criminal activity, as opposed to maintaining security in the facility. *See De Lancie v. Superior Court,* 31 Cal.3d 865, 183 Cal.Rptr. 866, 647 P.2d 142, 150 (1982), *superseded by statute as stated in People v. Loyd,* 27 Cal.4th 997, 119 Cal.Rptr.2d 360, 45 P.3d 296, 298 (2002). The necessity requirement does not oblige law enforcement officials to explain why they did not attempt investigative techniques that are contrary to law.

**23.** The most problematic aspects of the Olsen affidavits are the sections purporting to explain why pen registers, trap and trace devices, and trash searches would be unsuccessful investigative techniques *simply because of* their inherently limited nature.

*v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000).

■■■■■ A defendant is entitled to a *Franks* hearing where he or she makes "a substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of necessity." *Shryock,* 342 F.3d at 977 (citation omitted). As we have explained in the preceding sections, the district court properly rejected Appellants' arguments that the Olsen affidavits contained material misstatements or omissions. The district court therefore did not err in denying Appellants' request for a *Franks* hearing.

## IV. Outrageous government conduct

■■■■■ Appellants argue that the district court erred in failing to dismiss the indictment because of outrageous government conduct in the process of investigating this case. Appellants claim that various aspects of the government's involvement with and reliance on informant John "Stranger" Turscak resulted in conduct so improper that their due process rights have been violated. They also argue that the district court should have dismissed the indictments under its supervisory power as a sanction for the government misconduct. Appellants Fernandez, Gonzales, Sanchez and Schoenberg all joined a motion by co-defendant Cervantes raising this claim at the district court. We review the due process claim as to these appellants de novo, *United States v. Gurolla,* 333 F.3d 944, 950 (9th Cir.2003), but review the super-

visory power claim under the abuse of discretion standard. *Id.* We review the claims with respect to appellants Gavaldon and Contreras for plain error. *See United States v. Duncan,* 896 F.2d 271, 275 (7th Cir.1990). In reviewing these claims, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless clearly erroneous. *Gurolla,* 333 F.3d at 950.[24]

■■■■ "The defense of outrageous government conduct is limited to extreme cases in which the government's conduct violates fundamental fairness and is shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *Gurolla,* 333 F.3d at 950 (citations and internal quotation marks omitted). We have found outrageous government conduct in instances where the government has "engineer[ed] and direct[ed] the criminal enterprise from start to finish," *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991), and in "that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant." *United States v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.1986) (citation omitted), *vacated in part on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986).

We do not find such conduct here. Appellants claim that the government engaged in outrageous conduct in this case because it used Turscak as a confidential informant even as he continued to engage in illegal conduct and, particularly, as he

24. The district court did not make factual findings in denying the motions to dismiss the indictment as to the appellants in this case. It did, however, make such findings in ruling on a similar motion by co-defendant Martinez. Since the factual and legal bases for the motions were all the same, we deem it appropriate to rely on the factual findings the district court made in Martinez's case. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir.1992) ("[W]e may take notice of proceedings in other courts ... if those proceedings have a direct relation to matters at issue.").

continued to discuss a potential attack on co-defendant Martinez with other Eme members and associates. The district court found, however, that "[a]lthough the Government was aware that Turscak was talking about a conspiracy to murder Martinez, Turscak was cooperating with the investigation so there was no reason to believe that he actually intended to carry out the murder." The district court further found that it could not be established that Turscak carried out an attempt on Martinez's life in December 1997. Appellants offer no argument about why these findings are clearly erroneous. Regarding other aspects of Turscak's illegal conduct, the government was, at worst, negligent in its handling of Turscak as an informant, but its conduct does not rise to the level required for a finding of a due process violation. *See United States v. Barrera–Moreno,* 951 F.2d 1089, 1092 (9th Cir.1991) ("Due process is not violated unless the conduct is attributable to and directed by the government. Passive tolerance ... of a private informant's questionable conduct is less egregious than the conscious direction of government agents typically present in outrageous conduct challenges.") (citation, internal alterations and quotation marks omitted); *see also United States v. Stenberg,* 803 F.2d 422, 430–31 (9th Cir.1986) (rejecting outrageous government conduct claim even where government agent engaged in illegal conduct himself).

■■■■■ For the same reasons, we also conclude that the district court did not abuse its discretion in failing to dismiss the indictment under its supervisory powers. "A court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." *United States v. Ross,* 372 F.3d 1097, 1109 (9th

Cir.2004). To justify the exercise of the court's supervisory powers, however, prosecutorial misconduct must "(1) be flagrant and (2) cause 'substantial prejudice' to the defendant." *Id.* at 1110 (citation omitted). In light of the district court's findings of fact, we cannot say that the government's use of Turscak as an informant amounted to flagrant misconduct. *See Barrera–Moreno,* 951 F.2d at 1091–93 (reversing dismissal of indictment under supervisory powers because of government informant's use and distribution of cocaine during investigation). Moreover, Appellants have not shown that they were substantially prejudiced by any government misconduct.[25]

■■■■■ Appellant Sanchez raises some additional issues which, he argues, make the claim of outrageous government conduct particularly strong in his case. Sanchez argues that Turscak engaged in a concerted effort to have Sanchez join a conspiracy to murder Martinez, and that the government sought to keep this information from the defense. Sanchez's claims may have had some merit had the government charged him with conspiracy to murder Martinez. The government did not, however, and there is therefore no basis for Sanchez's claim that Turscak created the crimes with which he was charged. None of the conversations between Turscak and Sanchez regarding Martinez was used for any purpose by the government, so we fail to see how Sanchez could have been prejudiced by their occurrence. Nor do we find any merit to Sanchez's claim that the government concealed relevant information: Sanchez conceded that the government provided him with the actual tape of the conversations between Turscak, Detevis and Sanchez (Consensual Tape # 142), and

---

**25.** In addition, because the district court did make factual findings regarding the events underlying this claim in its order in the Martinez case, we do not need to remand to the district court for the evidentiary hearing Appellants request.

Sanchez has not disputed the government's reasonable explanation for not providing him with a transcript. Moreover, Sanchez quoted extensively from that tape in his mid-trial motion for a dismissal of the indictment, which undermines any claim that he was deprived of relevant evidence. For these reasons, we conclude that the district court properly rejected Sanchez's request for dismissal of the indictment based on outrageous government conduct.

## V. Denial of mistrial

 Appellants argue that the district court abused its discretion in failing to grant their motion for a mistrial based on co-defendant Roland Ramirez's mid-trial decision to plead guilty and testify for the government. We review the denial of a motion for a mistrial under the abuse of discretion standard. *United States v. Prime*, 363 F.3d 1028, 1037 (9th Cir.2004).

Appellants' first argument is that Ramirez and/or his counsel were present during defense strategy sessions at the same time that they were negotiating a plea deal with the government.[26] Appellants assert that this situation violated their Sixth Amendment right to counsel, particularly since—they claim—"[t]here is no doubt that Ramirez ... informed the Government of the appellants' discussions and strategies." 2002 WL 32302660 at *148–'49. The government points out that Appellants did not claim at the district court that Ramirez or his counsel had divulged any information regarding strategy to the prosecution, so as to give the district court an opportunity to address such allegations.

 In order to show that the government's alleged intrusion into the attorney-client relationship amounted to a violation of the Sixth Amendment, a defendant must show, at a minimum, that the intrusion was purposeful, that there was communication of defense strategy to the prosecution, *or* that the intrusion resulted in tainted evidence. *United States v. Danielson*, 325 F.3d 1054, 1067 (9th Cir.2003) (citing *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)). Appellants have made no showing on any of these prongs. First, nothing in the record suggests that the government intended or encouraged Ramirez or his counsel to take part in the defense strategy sessions as its informant. Second, despite their unsupported allegations, Appellants have made no showing that any defense strategy was actually communicated to the government. To the extent that the record is barren on this issue, it is only due to the fact that Appellants did not raise their claims before the district court. *Cf. United States v. Frederick*, 78 F.3d 1370, 1375 (9th Cir. 1996) (stating that it is defendant's burden to show that district court abused its discretion in denying motion for a mistrial). Finally, Appellants have made no claim that any of the evidence presented at trial had been tainted by the alleged intrusion. In fact, the district court generally precluded Ramirez from testifying about any communications he had with Appellants after his initial conversations with the government. The record therefore does not support Appellants' claims that their Sixth Amendment rights were violated. *Cf. Partington v. Gedan*, 961 F.2d 852, 863 (9th Cir.1992) ("[B]efore it amounts to a violation of the Sixth Amendment, any government interference with the [attorney-client] privilege must substantially prejudice the criminal defendant.").

---

**26.** Appellants are somewhat inconsistent in their allegations as to who was present at the defense strategy sessions: their argument at the district court referred to Ramirez's counsel's presence, and they mention that presence again in their opening brief, 2002 WL 32302660 at *145, 147; however, elsewhere in their brief they appear to assert that it was Ramirez himself who was present at the defense discussions, 2002 WL 32302660 at *148.

■ Appellants' second claim is that their rights to a fair and impartial jury were violated because Ramirez's counsel was actively involved in the jury selection process and struck one juror who had been accepted by Appellants. The district court rejected this claim because it made a factual finding that Ramirez had not entered into any cooperative agreement with the government at the time of jury selection, and because of the presumption that each defendant's attorney was protecting his or her individual client's interests. Because Appellants have not attempted to challenge the district court's factual findings as clearly erroneous, we conclude that Ramirez and his counsel were well within their rights to strike jurors from the jury. Appellants cannot point to any case supporting the proposition that the right to an impartial jury is violated when a co-defendant who was active during jury selection decides to plead guilty during the trial, nor has our research revealed such a case.

We conclude that the district court did not abuse its discretion in denying Appellants' motion for a mistrial.

## VI. Denial of motions for severance

■ The district court's denial of a motion to sever is reviewed for an abuse of discretion. *United States v. Pitner,* 307 F.3d 1178, 1181 (9th Cir.2002). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Baker,* 10 F.3d 1374, 1386 (9th Cir.1993) (as amended) (citation and internal quotation marks omitted).[27]

■ Inquiry into the prejudicial effect of a joint trial involves consideration of several factors, including: (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether Appellants could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Id.* at 1387–89; *United States v. Hanley,* 190 F.3d 1017, 1027 (9th Cir.1999); *United States v. Cruz,* 127 F.3d 791, 798–99 (9th Cir.1997), *overruled on other grounds by United States v. Jimenez Recio,* 537 U.S. 270, 123 S.Ct. 819, 154 L.Ed.2d 744 (2003). *See also Baker,* 10 F.3d at 1388 (noting, with respect to the fourth factor, that neither a better chance of acquittal in a separate trial nor the mere fact of joint trial with a more culpable defendant is sufficient in itself to require severance). The first two factors are the most important in this inquiry. *See id.* at 1387 (reaffirming that "the best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts," and noting that limiting jury instructions are a " 'critical factor' in assessing the jury's ability to compartmentalize the evidence").

The indictment in this case contained twenty-nine counts, charging twenty-four individuals with racketeering, racketeering

---

**27.** It is somewhat unclear what precedential effect other holdings in *Baker* may have. *See United States v. Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000) (concluding that *Baker* and other cases are inconsistent with *Apprendi* ), *overruled in relevant part by United States v. Buck-*

*land,* 289 F.3d 558, 567–68 (9th Cir.2002) (as amended) (en banc); *but see Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). However, its discussion of the legal principles governing severance of joint trials remains good law.

conspiracy, conspiracy to aid and abet narcotics trafficking, VICAR offenses, and a single felon-in-possession count. After all the defendants moved to sever the joint trial, the district court severed Martinez and eight other death-eligible defendants, because it "believe[d] there's a heightened scrutiny and requirement in death penalty matters."[28] Specifically, the district judge found that "there's a big difference between violence and murder and attempted murder, and narcotics charges or conspiracy charges involving just narcotics."

Appellants point to three district court rulings to support their assertion that the district court abused its discretion in severing only the death-eligible defendants from the remaining eleven defendants. Although Appellants decline to argue that any of these three rulings was itself erroneous, they ask us to consider the cumulative effect of the decisions: (1) the grant of the government's motion for empaneling an anonymous jury; (2) the grant of the government's request that the nine incarcerated defendants be shackled; and (3) the admission of photographs of certain tattoos on some of the defendants in order to demonstrate their membership in and allegiance to the Eme. Although Appellants do not specifically allege that a particular trial right was violated as a result of these rulings or the failure to sever the joint trial of the eleven non-capital defendants,[29] their arguments are most closely related to part of the fourth factor identified in *Baker*—the risk that the joint trial would prevent the jury from making a reliable judgment about guilt or innocence. As such, these arguments will be considered last, after the other *Baker* factors.

## A. Jury's ability to compartmentalize evidence

We have previously noted that a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials. *See Cruz*, 127 F.3d at 799; *Baker*, 10 F.3d at 1389; *see also United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.1992) ("Proof of [RICO] elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless.").

Given the multiplicity of counts facing the eleven co-defendants—alleging different conspiracies with different goals, as well as several predicate RICO or stand-alone VICAR offenses involving different sub-groups of the co-defendants—the jury's ability to evaluate the evidence against each defendant independently was certainly put to the test. Nevertheless, to the extent that the ability to compartmen-

---

**28.** After the government decided to seek the death penalty against Martinez alone, the district court severed him from the other previously death-eligible defendants.

**29.** Schoenberg alleges generally that her right to due process was violated by the denial of her motion to sever, but that does not appear to be the kind of specific violation *Baker* con-templates. *See* 10 F.3d at 1389 (citing, as examples, "inconsistent defenses, violation of confrontation rights, or unavailability of co-defendants' exculpatory testimony," and noting that "[b]road and general allegations of prejudice from the length of the trial are not enough to require the district court to grant a severance").

talize is demonstrated by acquittal or failure to convict all defendants on all counts, *see Baker*, 10 F.3d at 1387 (citing *United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir.1987)), the joint trial did not affect the jury's ability to evaluate each defendant's culpability individually. The jury acquitted Adrian Nieto on three of four predicate acts and four of six counts, and hung on the sole remaining predicate act and two remaining counts; it acquitted Juan Garcia on one predicate act and two counts; acquitted Jimmy Sanchez on one predicate act and one count; acquitted Sally Peters on one count; and it hung on one predicate act and one of the VICAR murder conspiracy counts for Frank Fernandez.[30]

## B. Use of limiting instructions

We have repeatedly held that a district court's careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered, can reduce or eliminate any possibility of prejudice arising from a joint trial. *See Hanley*, 190 F.3d at 1028; *United States v. Nelson*, 137 F.3d 1094, 1108 (9th Cir.1998); *Baker*, 10 F.3d at 1388; *see also Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Throughout the trial, the district court instructed the jury that it must consider the evidence against each defendant and evaluate each defendant's guilt separately, stating on the first day of trial and repeatedly throughout the proceedings:

> [A] separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime charged against the defendant separately. Your verdict on any count as to any defendant . . . should not control your verdict on any other count or as to any other defendant.

Combined with its detailed instructions on the law governing conspiracies, and on substantive RICO violations, the district court's explanatory and limiting instructions to the jury are more than sufficient to guard against the possibility of prejudice to the defendants. *See Hanley*, 190 F.3d at 1027–28 (assessing similar instructions as adequate to cure any risk of prejudice); *cf. Kotteakos v. United States*, 328 U.S. 750, 769, 66 S.Ct. 1239, 90 L.Ed. 1557 (1943) (noting that an appropriate instruction to avert spillover prejudice "in cases where related but separate conspiracies are tried together" would be "that the jury should take care to consider the evidence relating to each conspiracy separately from that relating to each other conspiracy charged").

## C. Nature of evidence and legal concepts involved

*Baker's* reference to the competence of the ordinary juror came from its consideration of a Second Circuit case on severance, where that court opined:

> There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence. No such showing was made in the instant matter. The crimes here may have been large in number and variety, but they were rather ordinary in nature, except in their viciousness. The evidence could also be understood without difficulty, the alleged complexity stemming more from the abundance of evidence than from the

---

**30.** Nieto, Garcia and Peters are not among the six Appellants in these consolidated appeals, but were among the total of eleven non-capital co-defendants in the trial that is the subject of this appeal.

subtlety of the analysis needed to consider it.

*DiNome*, 954 F.2d at 842 (quoted in *Baker*, 10 F.3d at 1388). Although the inclusion of several RICO and VICAR counts make this case more difficult in terms of the legal concepts involved than was true for *Baker* and the Second Circuit cases that it cites, the predicate or underlying crimes alleged are well within the ability of the ordinary juror to understand. *See Baker*, 10 F.3d at 1388 (holding that "[d]rug manufacturing and distribution, even on such a large scale as in this case, is not beyond the competence of the ordinary juror"). Moreover, given the district court's careful and detailed instructions on the elements the prosecution must prove in order to establish a violation of the RICO and VICAR statutes, the repetition of some of these instructions on the jury verdict form, and the jury's selective verdict on several counts and predicate acts within the racketeering count, we conclude that the jurors were able to understand the fundamental elements of the racketeering-related offenses and apply them to the evidence presented at trial.

### D. Possibility of unreliable verdict

As discussed above, Appellants point to three district court rulings—empaneling an anonymous jury, shackling nine of eleven co-defendants, and admitting photos of tattoos—which they assert have the combined effect of undermining the presumption of innocence in such a large joint trial. Schoenberg, in particular, contends that in light of her joint trial with her incarcerated, shackled, and heavily tattooed co-defendants, the jury could not possibly have deliberated on her individual culpability.

### 1. Anonymous jury

A district court's decision to empanel an anonymous jury is reviewed for an abuse of discretion. *Shryock*, 342 F.3d at 971.[31] In evaluating the district court's decision, we consider evidence available at the time the jury was empaneled, and all relevant evidence introduced at trial. *Id.* Under our case law, the decision to empanel an anonymous jury will be upheld "where (1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." *Id.* (adopting the First Circuit's test from *United States v. DeLuca*, 137 F.3d 24, 31 (1st Cir.1998)). Although these factors are neither exclusive nor dispositive, courts have recognized the need for jury protection based on a combination of factors, including:

> (1) the defendants' involvement with organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that the defendants will suffer lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*Shryock*, 342 F.3d at 971 (citations omitted); *see Darden*, 70 F.3d 1507, 1532 (8th Cir.1995) (collecting cases applying these five factors); *see also Baker*, 10 F.3d at 1390 (recognizing, despite its skepticism about certain justifications for large joint

---

**31.** Even though Appellants do not argue that each of these decisions was in error, we consider the relevant standards of review as guidelines to our analysis, because they establish the limits of trial courts' discretion to fashion remedies that balance judicial efficiency, reliability of criminal proceedings, and possible prejudice to defendants.

trials, "that possible loss of testimony, and more importantly, risk to the lives of witnesses must be factored into the equation on a case-by-case basis").

The record reveals that all five factors were met in this case. Moreover, the district judge was careful to offer neutral justifications for the jury's anonymity that focused on juror confidentiality and suggested that such procedures are routine. Similarly neutral explanations, suggesting virtually identical reasons for anonymity, have been viewed by this and other circuits as adequate guards against the possibility of prejudice. *See, e.g., Shryock,* 342 F.3d at 972–73 (citing *Darden,* 70 F.3d at 1533 and *United States v. Ross,* 33 F.3d 1507, 1521–22 (11th Cir.1994)); *United States v. Marrero–Ortiz,* 160 F.3d 768, 776 (1st Cir.1998); *United States v. Edmond,* 52 F.3d 1080, 1093 (D.C.Cir.1995); *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991).

### 2. Shackling most of the defendants

A decision to shackle defendants is reviewed for an abuse of discretion. *Morgan v. Bunnell,* 24 F.3d 49, 50 (9th Cir.1994) (per curiam). Ninth Circuit law places restrictions on that discretion, however: (1) "the court must be persuaded by compelling circumstances that some measure was needed to maintain the security of the courtroom"; and (2)"the court must pursue less restrictive alternatives before imposing physical restraints." *Jones v. Meyer,* 899 F.2d 883, 885 (9th Cir.1990) (internal quotation marks omitted).

Even in light of the limitations placed on district courts' discretion, Appellants' assertion of prejudice based on the shackling of nine of the eleven co-defendants is meritless. *See Morgan,* 24 F.3d at 51 ("The judge has wide discretion to decide whether a defendant who has a propensity for violence poses a security

risk and warrants increased security measures."); *id.* at 52 (concluding that the district court "protected Morgan's presumption of innocence" by removing handcuffs, excusing the jury when he walked to the stand in leg-irons, and "took adequate precautions to minimize the effects of the shackles on the jury"). As Appellants concede in their opening brief, the district court ordered that the incarcerated defendants "would not be handcuffed," that the shackles be "padded to avoid noise," that "no one would stand when the jury entered the courtroom, to hide the fact that the defendants were restrained," 2002 WL 32302660 at *152, and that "ankle chains were never to be shown to the jury." *Id.* n. 75. The cases upon which they rely are either easily distinguished or do not support their arguments: two involved or discussed circumstances in which the shackles or handcuffs were apparent to the jury during the trial, and one supports the district court's exercise of discretion in shackling the defendants here. *See Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (discussing *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), in which the Court found "it possible that the *sight* of shackles and gags might have a significant effect on the jury's feelings about the defendant," but noting that even binding and gagging may nevertheless be warranted in the case of "a particularly obstreperous and disruptive defendant") (emphasis added); *see also Morgan,* 24 F.3d at 51–52 (upholding shackling where district court took precautions to ensure that jury did not know defendant wore leg-irons).

### 3. Admission of gang-related tattoos

Appellants' last argument, that the admission of photographs of their tattoos undermined the presumption of innocence, is equally meritless. The district court found photographs of tattoos that

were relevant to the charges in the indictment probable and admissible, in that they tended to prove gang membership, which the government alleged was a precursor to membership in the Mexican Mafia. The court ruled that some of the tattoos in the photos were irrelevant and prejudicial and therefore inadmissible, because they did not indicate gang membership. The balance between probative value and prejudicial effect was fairly struck by the district court, and we conclude that the admission of the relevant tattoo photographs and stipulations did not unfairly prejudice the appellants.

To support their challenge to the denial of their motions for severance, Appellants rely heavily on our extensive discussion in *Baker*, where, despite upholding the district court's decision not to sever, we expressed our concerns about the great potential for prejudice to defendants that is inherent in "such mega-trials." *See* 10 F.3d at 1389–93. Despite its size and complexity, however, Appellants' trial falls close to or within the allowable limits suggested by the *Baker* panel. *Compare* 10 F.3d at 1386 (calling the trial "one of the lengthiest and costliest trials in this nation's history," and noting that it involved fifteen co-defendants, a forty-four count indictment, 30,000 pages of transcript, 250 witnesses, evidence of over 2,000 narcotics transactions, and took sixteen months to try), *with* 2003 WL 22706781 at *144 (noting that this trial lasted only four months and involved only about 10,000 pages of transcript).

Last, contrary to Appellants' arguments, the district court did consider the possible prejudicial effect of a joint trial on each defendant. Indeed, the court spent a great deal of time considering the motions to sever, and evaluating each defendant's alleged offenses and role in the alleged enterprise, before ruling on the motions. We therefore hold that the district court did not abuse its discretion when it denied the non-capital defendants' motions to sever.

## VII. Jury instructions

### A. Failure to instruct the jury on the meaning of the phrase "ad hoc"

 Appellants argue that the district court erred by failing to define the term "ad hoc" in its instructions regarding the definition of a RICO enterprise. We review the district court's formulation of jury instructions for an abuse of discretion. *United States v. Franklin*, 321 F.3d 1231, 1240–41 (9th Cir.), *cert. denied*, 540 U.S. 858, 124 S.Ct. 161, 157 L.Ed.2d 106 (2003).

In its instructions regarding what constitutes an "enterprise" under the RICO statute, the district court explained to the jury that an enterprise "must have a structure for making decisions." It then instructed the jury that"[t]he structure must provide a mechanism for controlling and directing the affairs of the entity on an ongoing continuous basis, *rather than an ad hoc basis*." (emphasis added). The district court did not further define the term "ad hoc."

 "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Shryock*, 342 F.3d at 986 (citation omitted). Appellants do not claim that the instruction as a whole is misleading or inadequate, a wise course since the language of the instruction is virtually identical to that set forth by this court in *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir.1996) (holding that, to constitute an enterprise under RICO, the enterprise's structure must provide "some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis"). Appellants are therefore left to argue that the district court should have defined the

term "ad hoc" because it is beyond the understanding of the general population. *Cf. Shryock,* 342 F.3d at 986 ("[T]he district court need not define common terms that are readily understandable to the jury."). Even accepting the debatable proposition that "ad hoc" is beyond the understanding of the average juror, we conclude that the jury would have been able to understand what type of structure a RICO enterprise must have (i.e., one that provides "a mechanism for controlling and directing the affairs of the entity on an on-going continuous basis") from the remainder of the instruction. Moreover, we have previously held that a district court is not required to define terms that would normally be beyond the general knowledge of jurors if the terms have been covered extensively during the trial. *United States v. Sarno,* 73 F.3d 1470, 1486 (9th Cir.1995) (holding that the district court was not required to define "pro forma" because of extensive discussions regarding the term at trial). In this case, the structure of the alleged RICO enterprise was a significant point of contention before the jury, and at least one defense counsel provided a "homey" but accurate definition of the term "ad hoc" for the jury during closing arguments.[32]

We conclude that the district court did not abuse its discretion in failing to instruct the jury on the definition of "ad hoc."

## B. Failure to instruct the jury on multiple conspiracies

 Appellants did not object to the conspiracy instructions given to the jury, so we review this claim for plain error. *Jones v. United States,* 527 U.S. 373, 388, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *Franklin,* 321 F.3d 1231. A multiple conspiracies instruction is required only if the defendants' theory of the charged conspiracy or conspiracies "is supported by law and has some foundation in the evidence." *United States v. Anguiano,* 873 F.2d 1314, 1317 (9th Cir.1989) (internal quotation marks omitted). "[E]ven if the evidence would have supported such an instruction, the failure to give it is error only if the instructions as a whole, considered in the context of the entire trial, did not fairly and adequately cover the issues," including that theory. *Id.* Evidence sufficient to support a multiple conspiracies instruction is present where "a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies *unrelated to the overall conspiracy* charged in the indictment." *Id.* (emphasis added) (citing *Kotteakos,* 328 U.S. at 750, 66 S.Ct. 1239).[33]

---

**32.** We note this passage of Fernandez's counsel's closing statements, in which he discussed the jury instructions regarding the definition of an enterprise:

Did, in fact, [the Eme] have *rules that were* followed? Did it have a mechanism for making decisions on anything other than an *ad hoc* basis[?]

Do you know what *"ad hoc"* means? It means that people get together to make decisions, but it's not continuous. When you have *ad hoc* committees and organizations, you set up the committee to deal with a particular problem. Once that problem is solved it dissolves. That's what *"ad hoc"* means.

**33.** The question of whether an instruction on multiple conspiracies is warranted is related to the issues of "spillover" or transference of guilt that are raised by trial severance, as discussed above. *See Anguiano,* 873 F.2d at 1317–18 & n. 2 (holding that multiple conspiracies instruction is required where there is possibility of prejudicial variance between indictment and trial proof, and noting that such an instruction "is designed precisely to cure the problem of *Kotteakos* 'spillover' " and would not cure other prejudicial variance problems).

▆▆▆▆ We hold that the jury instructions given by the district court fairly and adequately covered the defense theory of the case. In addition to instructing the jury on what it must find in order to conclude that the conspiracies charged in counts two, three, and four existed, the district court also told the jury:

> With regard to each of the conspiracies charged in the First Superseding Indictment, you must decide whether the conspiracy charged in the indictment existed and, if it did, who at least some of its members were. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

Although the district court did not specifically use the term "multiple conspiracies," the instruction is sufficient to cover the Appellants' theory of the case—that the evidence offered at trial did not establish the single overarching conspiracy alleged in each of counts two, three, and four, but rather several smaller and unrelated conspiracies. The district court's detailed instructions on the elements of a conspiracy further support this conclusion: the jury was instructed on the legal definition of a conspiracy, with its required elements of an agreement among the participants with the specific intent to agree; specific intent to commit the particular crime charged; and overt acts to further or accomplish the object of the conspiracy. Given these instructions, the jury could decide that the large overarching conspiracy charged by the government in each count did not exist, but that other unrelated conspiracies did; or that a particular defendant did not participate in the overall conspiracy, but rather in a different and unrelated conspiracy.[34] The district court did not commit plain error.

## C. Challenge to instructions on the interstate nexus elements of Counts One and Two

▆▆▆ Fernandez argues that the district court erred in instructing the jury that it could find the required nexus with interstate commerce for the RICO counts if it found that the enterprise had a de minimis effect on interstate commerce.[35] Under *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Fer-

---

34. Our precedents require a multiple-conspiracies instruction only in the event that the evidence showed other conspiracies that were *unrelated to* or *separate from* the conspiracy charged, because it is well-established that "a single conspiracy may involve several subagreements or subgroups of conspirators." *Bibbero*, 749 F.2d at 587 (citation omitted). *See Anguiano*, 873 F.2d at 1317; *see also Kotteakos*, 328 U.S. at 769, 66 S.Ct. 1239 (discussing the trial court's confusion of "the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character"). Where the agreements and actions of different groups of conspirators can be traced to an overall agreement among them to achieve a common goal, and where the co-conspirators knew of each other's existence or benefitted from each other's activities, then a single conspiracy has been proved. *Duran*, 189 F.3d at 1080. This is especially true where, as here, key members or the method of operation have remained constant throughout the duration of the alleged conspiracy. *Id.*

35. The district court instructed the jury as follows:

> The fourth and final element which the government must prove as to Count One is that the enterprise itself, or the racketeering activities of those associated with it, had some effect upon interstate commerce. This effect upon interstate commerce could have occurred in any way and it need only have been minimal.

nandez asserts, the government was required to show that the regulated conduct had a substantial effect on interstate commerce. Because Fernandez did not raise this claim at the district court, we review for plain error. *Jones,* 527 U.S. at 388, 119 S.Ct. 2090.

Fernandez's challenge to the jury instructions is foreclosed by our recent decision in *Shryock.* In that case, we described and rejected the same argument Fernandez raises in this appeal:

> Appellants argue that the district court erroneously instructed the jury that [the interstate nexus element of the RICO counts] could be satisfied if the "the activities of the enterprise affect interstate commerce in some minimal way." According to Appellants, the correct standard requires the jury to find that the enterprise had a "substantial" effect on interstate commerce.... In *United States v. Juvenile Male,* we held that "all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce." 118 F.3d 1344, 1347–49 (9th Cir.1997). The district court, therefore, correctly instructed the jury that a de minimis [e]ffect on interstate commerce was sufficient to establish jurisdiction under RICO.

342 F.3d at 984; *see also United States v. Bagnariol,* 665 F.2d 877, 892 (9th Cir.1981) ("The effect on commerce is an essential element of a RICO violation, but the required nexus need not be great. A minimal effect on interstate commerce satisfies this jurisdictional element.").

The district court therefore properly instructed the jury on the interstate nexus requirement for counts one and two.

## D. Failure to instruct the jury that Counts Three and Four required a nexus with interstate commerce

■ Appellants argue that the district court erred in failing to instruct the jury that it must find a nexus with interstate commerce in order to convict on counts three and four, the drug conspiracy counts under 21 U.S.C. § 846. Because Appellants did not raise this objection before the district court, we review for plain error. *Jones,* 527 U.S. at 388, 119 S.Ct. 2090.

As we explained earlier, an effect on interstate commerce is not an element of a drug conspiracy offense under 21 U.S.C. § 846. *Cf. United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990) (stating that "no proof of an interstate nexus is required in order to establish jurisdiction of the subject matter" in prosecution under 21 U.S.C. § 841(a)) (quoting *United States v. Montes–Zarate,* 552 F.2d 1330, 1331 (9th Cir.1977)). The district court therefore did not plainly err in failing to instruct on an interstate nexus. Appellants' argument that the jury instructions relieved the government of its burden of proving one of the elements of the offense fails for the same reasons.

## E. Failure to instruct the jury that Counts Fourteen, Fifteen and Twenty–One required a nexus to interstate commerce as to the underlying act

■ Appellants argue that the district court erred by failing to instruct the jury that the specific violent acts charged in VICAR counts fourteen, fifteen and twenty-one must have had an effect on interstate commerce. Because the appellants did not raise this objection to the jury instructions before the district court, we review the claim for plain error. *Jones,* 527 U.S. at 388, 119 S.Ct. 2090.

Appellants concede that § 1959 does not itself require a nexus between interstate commerce and the specific act of violence charged. The statute does require that the "enterprise" in relation to which the violent acts are committed be one that "is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). Appellants argue, however, that the acts that allegedly violate that statute must themselves have a nexus to interstate commerce. Their claim relies on the holding of one district court. *See United States v. Garcia,* 68 F.Supp.2d 802, 811 (E.D.Mich.1999). Even though the appellants deny they are making a facial attack on the statute, their challenge to the jury instructions is essentially a claim that the statute as written goes beyond the regulatory power of Congress. Such a claim has already been rejected by at least three circuits. *See United States v. Crenshaw,* 359 F.3d 977, 987 (8th Cir.2004); *United States v. Riddle,* 249 F.3d 529, 538 (6th Cir.2001); *United States v. Torres,* 129 F.3d 710, 717 (2d Cir.1997). Moreover, in the context of the substantive RICO statute, we have explained that the government need not show a nexus to interstate commerce for each predicate act underlying a RICO conviction. *See Bagnariol,* 665 F.2d at 892 ("[T]he [RICO] statute requires that the activity of the enterprise, not each predicate act, [affect] interstate commerce."). Under these circumstances, we cannot conclude that the district court's failure to instruct the jury that each violent act charged in the VICAR counts must have an effect on interstate commerce constituted clear or obvious error. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("At a minimum, [a] court of appeals cannot correct an error pursuant to [Federal Rule of Criminal Procedure] 52(b) unless the error is clear under current law."). We conclude that the district court did not plainly err in failing to instruct the jury that a nexus to interstate commerce must be found as to each violent act charged in the VICAR counts.

**F. Challenge to the instructions regarding the quid pro quo theory of motive for Counts Fourteen, Fifteen and Twenty–One**

■ Appellants argue that the district court's instruction on the motive element of the VICAR counts was misleading and an incorrect statement of the law. Because Appellants did not object to the instruction at the district court, we review for plain error. *Jones,* 527 U.S. at 388, 119 S.Ct. 2090.

As we explained earlier, the VICAR statute, 18 U.S.C. § 1959, contemplates two different motive theories for commission of a VICAR offense: a "quid pro quo crime" theory and a "status crime" theory. Although it is clear that the government has prosecuted all of the VICAR counts in this case under the "status crime" theory of the statute, the district court, in addition to instructing on the "status crime" theory, did instruct the jury on the alternative "quid pro quo crime" motive theory. Appellants have not, however, met their burden of showing that any error in the quid pro quo crime instruction violated their substantial rights as is required under plain error review. *See Olano,* 507 U.S. at 734–35, 113 S.Ct. 1770. We find it extremely unlikely that the jury relied on a theory of the case upon which the government expressly did not rely, and which had no support in the record. We therefore conclude that the district court's instruction on the quid pro quo theory of the VICAR counts did not constitute plain error.

**VIII. Failure to order a competency hearing sua sponte**

■■ Since Fernandez raises the issue of his competence for the first time on

appeal, we review for plain error the district court's failure to order a competency hearing sua sponte. *Cf. United States v. Lorenzo,* 995 F.2d 1448, 1456 (9th Cir. 1993). "The substantive standard for determining competence to stand trial is whether [Fernandez] had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding[,] and a rational as well as factual understanding of the proceedings against him." *Torres v. Prunty,* 223 F.3d 1103, 1106 (9th Cir.2000) (internal quotation marks and alterations omitted); *see also* 18 U.S.C. § 4241(a) (requiring court to order competency hearing sua sponte "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense").

■■■ Fernandez "was entitled to a hearing on his competency to stand trial if a reasonable judge would have ... a 'bona fide doubt' [about his] competence." *Torres,* 223 F.3d at 1108. A trial judge has a continuing, affirmative responsibility to ensure that a defendant is not tried while incompetent. *See Medina v. California,* 505 U.S. 437, 449, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *Drope v. Missouri,* 420 U.S. 162, 179, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Miles v. Stainer,* 108 F.3d 1109, 1112 (9th Cir.1997). Failure of the defense attorney to ask for a competency hearing may not be considered dispositive evidence of the defendant's competency. *Odle v. Woodford,* 238 F.3d 1084, 1088–89 (9th Cir.2001).

■■ Although Fernandez is correct that a trial judge should order a competency hearing on its own motion if it has a good faith doubt about the defendant's competence to stand trial, there must be "substantial evidence of incompetence." *Deere v. Woodford,* 339 F.3d 1084, 1086 (9th Cir.2003); *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 489 (9th Cir.1997). Among the factors our court considers to determine whether there was sufficient evidence of incompetence are "the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Miles,* 108 F.3d at 1112 (emphasizing that "[n]one of these factors is determinative. Any one of them may be sufficient to raise a reasonable doubt about competence."); *see also Amaya–Ruiz,* 121 F.3d at 489 (listing those three factors as "suggestive evidence" while noting that "no particular facts signal incompetence").

Fernandez asserts that the trial judge's remarks, where he noted there were times when Fernandez either nodded off or had difficulty staying awake, indicate that the court was aware of facts that should have triggered a competency hearing. The government counters that the only evidence offered in support of Fernandez's claim of incompetence is the court's offhand comment about him made at the sentencing of a co-defendant. Fernandez offers no medical opinions of his mental competence at any time, much less during any period relevant to his trial. Nor is there evidence that he behaved irrationally at any time during the pre-trial, trial, or sentencing phases of the criminal proceedings. On the contrary, to the extent that it is possible to conclude anything about Fernandez's competence in the absence of medical reports, the record suggests that he understood the nature and consequences of the proceedings, communicated with his attorney, and was able to assist in his defense.

The only apparent reference during the trial to Fernandez's sleepiness occurred when defense counsel asked for his client to be excused on one day of the trial

because he was falling asleep. When asked by the court, counsel explained that "[Fernandez is] more than sleepy . . . he's sick. And he's got a very bad headache that they gave him medication for this morning." The court informed Fernandez of his right to be present at stages of the criminal proceeding, offered him the option of remaining in court, and told him that he could leave but that he must personally consent to his absence. In a short exchange with the court, Fernandez then asked to be excused for the day because he felt "pretty sick," and indicated that he understood that he could request to be brought back to court at any time.

Since the only evidence offered by Fernandez is the trial court's comment on his sleepiness, and there was no other evidence during his trial to suggest incompetence, we hold that the district court did not commit plain error by failing to order a competency hearing. *See Williams v. Woodford*, 306 F.3d 665, 704 (9th Cir.2002) ("To the extent that Williams's dazed or inattentive demeanor was before the trial judge, we agree with the Eleventh Circuit that 'there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court—whether out of indifference, fear, confusion, boredom, or sleepiness—unless that defendant cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense.' ") (quoting *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir.1996)).

### IX. Denial of motions to suppress evidence obtained from residential search

#### A. Probable cause

We review the issuance of a search warrant by a magistrate judge for clear error, in order "to determine whether the magistrate had a substantial basis to conclude that the warrant was supported by probable cause." *United States v. Celestine*, 324 F.3d 1095, 1100 (9th Cir. 2003) (citation omitted). This standard of review is "less probing than de novo review and shows deference to the issuing magistrate's determination." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir.1993) (quoting *United States v. Angulo–Lopez*, 791 F.2d 1394, 1396 (9th Cir. 1986)). Probable cause exists when, considering the totality of the circumstances, the affidavit shows that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

In January 1999, FBI Special Agent Samuel Spencer submitted an affidavit ("the Spencer affidavit") to the District Court for the Central District of California, requesting the issuance of a search warrant for a residence located on Rambler Avenue in Palmdale, California ("the Rambler residence"). In addition to identifying the place to be searched and the items to be seized, Agent Spencer recounted his experience in investigating organized criminal enterprises, and his participation in a previous investigation of the Mexican Mafia. The affidavit stated that his conclusions were based on "[his own] training and experience, communications with other law enforcement officers, [his] review of reports prepared by law enforcement personnel, and [his] review of recordings, and summaries of recordings prepared by law enforcement personnel, of intercepted communications."

Much of the Spencer affidavit, which was based on a two-year multi-agency task force investigation, contained general information on the Mexican Mafia, including its structure, members, illegal activities, and methods of operation. Agent Spencer

attached the initial indictment to the affidavit, and asserted that it provided "probable cause for each defendant's association with the Mexican Mafia, and participation in the Mexican Mafia's criminal activities." At several places in the affidavit, he discussed his knowledge of the practices of Mexican Mafia members, using it (along with his training and experience) to explain the relevance of the items he expected to find in the residence to the charges in the indictment. He stated the reasons he believed that Fernandez and Gonzales both lived in the house. Last, he recited information, culled from the wiretaps, which he believed established probable cause that firearms and narcotics would be found at the Rambler residence, including Gonzales' statements that he had firearms, and particularly that "he has enough guns at his house"; Fernandez's statement that he possessed a gun; and repeated references to Fernandez's trafficking in narcotics. The Spencer affidavit did not mention Turscak or any other confidential informant. The warrant issued and was executed. The district court denied both Fernandez's motion to suppress the evidence recovered at the Rambler residence, and his motion for a *Franks* evidentiary hearing.[36]

Gonzales and Fernandez raise two arguments in their challenge to the Spencer affidavit. First, they claim that the general descriptions of the Mexican Mafia and its activities are insufficient to establish probable cause, because they provide no basis for a magistrate to find probable cause that contraband, firearms, or evidence would be found at the Rambler residence. Second, they argue that the intercepted calls are also insufficient to provide probable cause because the wiretaps were

invalid. Even if the intercepts were valid, however, Gonzales and Fernandez contend that those communications are stale and do not support the inferences the government attempted to draw from them, because they did not establish that the guns, narcotics, and other potentially relevant items were at the house, or still on the premises, even if they had been there at some time in the past.[37] These arguments are unavailing, because the information in the affidavit was sufficient to establish probable cause under well-settled circuit law.

We have repeatedly held that an issuing magistrate may draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense alleged. *See, e.g., United States v. Garza,* 980 F.2d 546, 551 (9th Cir.1992); *United States v. Terry,* 911 F.2d 272, 275 (9th Cir.1990) (citing *Angulo–Lopez,* 791 F.2d at 1399). In *Terry,* the panel noted that "a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found," 911 F.2d at 275 (citing *United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir.1987)), and concluded that the requesting agent's statement that he knew from "past experience that methamphetamine drug traffickers keep drugs, paraphernalia, records, and money in their homes or adjoining structures," combined with personal knowledge of the defendant's earlier possession of methamphetamine, was sufficient to establish probable cause for a warrant to search the residence. *Id.* at 275–76. *See also United States v. Gil,* 58 F.3d 1414, 1419 (9th Cir.1995) (concluding that affidavit in which "surveillance observations ... provided a sufficient basis for the judge to

---

**36.** Gonzales joined in Fernandez's motions.

**37.** Gonzales and Fernandez also argue that the affidavit omitted critical information that

would have established the absence of probable cause. We discuss this argument below, in connection with their *Franks* claim.

infer that the defendants lived at the residences ... and that they were involved in the drug trade" established probable cause).

■■■ While probable cause that a resident of the location has committed a crime is in itself insufficient to satisfy the standard, *Gil,* 58 F.3d at 1418; *Pitts,* 6 F.3d at 1369, we have also held that a magistrate is allowed to draw the reasonable inference that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Angulo–Lopez,* 791 F.2d at 1399, *quoted in Gil,* 58 F.3d at 1419; *Pitts,* 6 F.3d at 1369; *Terry,* 911 F.2d at 275. Moreover, we require "only a reasonable nexus between the activities supporting probable cause and the locations to be searched." *Ocampo,* 937 F.2d at 490 (citation omitted). In an oft-quoted explanation of *Illinois v. Gates'* "fair probability" standard, we held:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

*United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.1985) (emphasis in original, citations omitted), *overruled on other grounds by Gomez v. United States,* 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989).

■■■ Last, this Court has concluded that in cases involving ongoing narcotics businesses, lapses of several months—and up to two years in certain circumstances— are not sufficient to render the information in an affidavit too stale to support probable cause. *See Pitts,* 6 F.3d at 1369–70 (holding that four-month lapse between crack sale involving defendant in different location and affidavit was not enough to render information stale where affidavit supported inference that defendant was "more than a one-time drug seller"); *United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (evaluating staleness "in light of the particular facts of the case and the nature of the criminal activity and property sought" and holding that "[w]hen the evidence sought is of an ongoing criminal business," even a two-year lapse may not render information stale); *United States v. Dozier,* 844 F.2d 701, 707 (9th Cir.1988) ("The mere lapse of substantial amounts of time is not controlling in a question of staleness."). In this case, the earliest wiretap intercept occurred less than five months before the affidavit was submitted, a period that is insufficient to render the information stale in light of the crimes involved.

Agent Spencer's statements about the likelihood that the Rambler residence contained contraband or evidence relevant to the crimes charged, which were based on his own professional experience of the Mexican Mafia, combined with the information from the wiretaps, were sufficient to give the magistrate judge a substantial basis to conclude that the items sought were at the residence.[38] The issuance of the search warrant was not clearly erroneous.

---

**38.** Moreover, this Court has held that information as old as eight months or twenty-two months was not stale when considered in light of more recent information in the affidavit, which served to 'update' the earlier information. *See United States v. Collins,* 61 F.3d 1379, 1384 (9th Cir.1995) (eight-month lapse insufficient in light of information from six weeks before issuance of warrant); *United States v. Vaandering,* 50 F.3d 696, 700 (9th Cir.1995) (twenty-two month lapse did not render information stale when viewed with later information).

## B. Franks hearing

The same standards of review outlined above in connection with Appellants' motions for a *Franks* hearing on the wiretaps apply here. The two appellants argue that the district court erred when it denied Fernandez's motion for a *Franks* hearing, and allege two material omissions or misstatements: (1) contradictions between agent Spencer's claims that guns or drugs would be found inside the residence, and the intercepted telephone conversations which do not suggest that guns or drugs are anywhere in particular; and (2) the affidavit's failure to discuss Turscak's "astounding number" of criminal acts while working for the government, and the government's alleged acquiescence in it.

For all the reasons explored above with regard to the denial of the motion to suppress, the first argument fails. The alleged contradictions are not factual, but rather represent a difference of opinion between the Appellants and the issuing magistrate on whether an inference that the guns and drugs were in the house was reasonable. The magistrate judge's conclusion that the Spencer affidavit established probable cause to search the Rambler residence was not clearly erroneous. Given the legal insufficiency of the claim before it, and the paucity of supporting factual allegations, the district court did not err in denying the motion for a *Franks* hearing.

Gonzales' and Fernandez's second allegation, that the affidavit's failure to describe Turscak's criminal activity warranted an evidentiary hearing, is a claim that they did not raise before the district court when requesting the hearing. It is the general practice of our court not to entertain such challenges, unless failure to do so will result in manifest injustice. *See, e.g., United States v. Ullah,* 976 F.2d 509, 514 (9th Cir.1992); *Bolker v. Comm'r,* 760 F.2d 1039, 1042 (9th Cir.1985) (referring to "the 'exceptional' case in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process" and two other recognized exceptions to general rule). Refusing to consider this argument in the context of a challenge to the search warrant will not cause injustice in this case, because the parties have received a full hearing on the same underlying issues with regard to their claim of outrageous government conduct, and we concluded that it does not warrant relief.

Even if we entertained this claim, Appellants would lose, because they cannot show materiality. "In determining materiality, 'the pivotal question is whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause.' " *United States v. Chavez–Miranda,* 306 F.3d 973, 979 (9th Cir.2002) (quoting *United States v. Garcia–Cruz,* 978 F.2d 537, 541 (9th Cir.1992)). The affidavit neither refers to nor relies on Turscak's knowledge of the Mexican Mafia's practices, but rather claims to be based on Agent Spencer's own knowledge and experience as well as the observations of other law enforcement personnel. Even if knowledge of what the government euphemistically terms "Turscak's misconduct" had been included in the affidavit, it would have been irrelevant because he was neither the affiant nor an apparent source of information for the affidavit. Given the other information in the affidavit, "the shadow of suspicion cast upon [Fernandez and Gonzales] would remain." *Chavez–Miranda,* 306 F.3d at 979. No evidentiary hearing was warranted.

## X. Failure to strike witness testimony against Sanchez

Sanchez argues that the district court erred in failing to strike testimony offered by prosecution witness Tor-

visco in violation of the court's protective order. We review for an abuse of discretion both the district court's denial of a motion to strike evidence, *United States v. Little,* 753 F.2d 1420, 1445 (9th Cir.1984), and its determination regarding the violation of the court's order. *See United States v. Hobbs,* 31 F.3d 918, 921 (9th Cir.1994).

Before the trial, Judge Tevrizian issued a written order limiting the government in its presentation of evidence of "bad acts" by the appellants to those "referenced in the First Superseding Indictment." Sanchez claims that the testimony by witness Torvisco violated that order because it introduced evidence of Sanchez's participation in ten conspiracies to commit murder or assault, even though he was not charged with such conduct in the indictment.[39] The government points out that eight of these conspiracies were alleged in the indictment, but concedes that Sanchez was not alleged to have participated in them. The district court ruled that the conspiracies raised by Torvisco were "within the genre of the indictment." It also found that the government had not intended to hide anything from the defense and that any damage from Torvisco's testimony was "minimal."

■■■ Even if the district court abused its discretion in refusing to strike Torvisco's testimony regarding the uncharged conspiracies, any error was harmless. We analyze Sanchez's arguments under the harmless error standard used to review non-constitutional evidentiary rulings: we must reverse a conviction based on an erroneous evidentiary ruling, "unless it is more probable than not that the error did not materially affect the verdict." *United States v. Morales,* 108 F.3d 1031, 1040 (9th

Cir.1997) (en banc) (citation omitted). We conclude that under the *Morales* standard, it is more probable than not that any error by the district court did not materially affect the jury's verdict against Sanchez.

Torvisco's testimony about the uncharged conspiracies was relevant to two counts, since the conspiracies he described could be seen by the jury as either predicate acts for the substantive RICO violation alleged in count one, or overt acts to support the conspiracy charged in count two. The jury specifically found, however, that Sanchez participated in two *other* conspiracies—the conspiracy to murder Turscak, and a conspiracy to distribute narcotics—which independently constituted both predicate acts for the substantive count and overt acts for the conspiracy count. Therefore, even if the district court had struck Torvisco's testimony about the uncharged conspiracies, it is certain that the jury would still have convicted Sanchez on the relevant counts. Moreover, to the extent that Torvisco's testimony may have had an impact on the jury's consideration of the other counts with which Sanchez was charged, we conclude that any error in the admission of the testimony was harmless.

## XI. Cumulative error

■■■ In nearly every instance in which the Appellants claimed error in the proceedings leading to their convictions, we have found that the district court did not err. To those claims, cumulative error is simply inapplicable. *See United States v. Martinez–Martinez,* 369 F.3d 1076, 1090 (9th Cir.2004). To the extent that we have found that any claimed error of the district court was harmless, or that claimed error

---

**39.** The testimony referred to conversations discussing plans to murder or assault Jesse "Shady" Detevis, "Angel" from Rockwood, "Smokey from Hazard," "Joker from Glassell Park," "Little Man from Burlington," "Stranger from 213," "Shorty from Laguna Park," "Sparkey from Temple," "Chino from Geraghity," and Mariano Martinez.

did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because it is more probable than not that, taken together, they did not materially affect the verdict. *See United States v. Berry*, 627 F.2d 193, 201 (9th Cir.1980) (holding cumulative error not reversible if it is more probably harmless than not); *United States v. Wallace*, 848 F.2d 1464, 1476 n. 21 (9th Cir.1988) (amended opinion) (holding that errors not rising to level of plain error are to be considered in assessing cumulative error).

## XII. Sentencing Challenges

Appellants Fernandez, Gavaldon, Contreras, Gonzales and Sanchez raise individual challenges to their sentences. We address the challenges raised by Fernandez and Sanchez below. Contreras and Gonzales have submitted post-briefing filings arguing that their sentences should be reconsidered in light of the decisions by the Supreme Court in *Blakely v. Washington,* — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and by this court in *United States v. Ameline,* 376 F.3d 967 (9th Cir. 2004). After reviewing the record, we agree that, under *Ameline,* we are required to vacate the sentences of Contreras and Gonzales and remand their cases for re-sentencing.[40] However, because the Supreme Court has granted certiorari in two cases addressing the impact of *Blakely* on the federal sentencing guidelines, *see United States v. Booker,* 375 F.3d 508 (7th Cir. July 9, 2004), *cert. granted,* — U.S. —, 125 S.Ct. 11, 159 L.Ed.2d 838 (2004) (No. 04–104); *Fanfan v. United States,* 2004 WL 1723114, No. 03–47–P.H. (D. Me June 28, 2004), *cert. granted,* — U.S. —, 125 S.Ct. 12, 159 L.Ed.2d 838 (2004) (No. 04–105), we will stay the issuance of the mandate in the cases of Gonzales and Contreras pending the Supreme Court's decisions in *Booker* and *Fanfan.*[41] If the Supreme Court rules that its *Blakely* decision does not apply to the sentencing guidelines, we will amend this opinion to address the sentencing challenges that Contreras and Gonzales had raised prior to *Blakely.*

Gavaldon has also filed a motion seeking to raise a *Blakely* challenge to his sentence. After reviewing the record, however, we do not find *Blakely* to be implicated in Gavaldon's case. Therefore, we do not vacate Gavaldon's sentence. Because of the potential broad-ranging implications that the Supreme Court's decisions in *Booker* and *Fanfan* may have in federal sentencing, however, we will, out of an abundance of caution, order that the mandates as to all appellants except Sanchez be stayed until further order of the court.[42] *See United States v. Lenoci,* 377 F.3d 246, 248 n. 1 (2d Cir.2004).

---

**40.** In both of these cases, the district court enhanced the appellants' sentences based on conduct which was neither found by a jury nor admitted by the appellants. Under *Ameline,* such enhancements constitute a violation of the Sixth Amendment. *See Ameline,* 376 F.3d at 980 ("[W]e hold that the district judge's imposition of this sentence after determining the material sentencing facts by a preponderance of the evidence, rather than relying on a jury's determination of the facts beyond a reasonable doubt, violated Ameline's Sixth Amendment rights as explained in *Blakely.*").

**41.** Our review of the record indicates that none of the *Blakely* issues raised by Contreras or Gonzales would affect the portion of the sentences that those appellants would serve between now and the Supreme Court's disposition in *Booker* and *Fanfan.* If our reading of the record is incorrect, however, the appellants may file motions requesting that we remand the matter to the district court for re-sentencing prior to the decisions in *Booker* and *Fanfan.*

**42.** As explained below, we will remand Sanchez's case for re-sentencing on an issue independent of *Blakely.*

## A. Fernandez's constitutional challenges to his life sentences

▉▉▉▉▉ Fernandez argues that the life sentences imposed on him because of his convictions on the RICO counts (counts one and two) violate the Eighth Amendment because they are grossly disproportionate to the sentence he might have received if convicted in another state. We review de novo whether a sentence violates the Eighth Amendment. *United States v. Bland*, 961 F.2d 123, 128 (9th Cir.1992).

Fernandez's life sentence is not so grossly disproportionate that it violates the Eighth Amendment. In *Harmelin v. Michigan*, the Supreme Court held that a sentence of life without parole for the crime of possessing 672 grams of cocaine did not violate the Eighth Amendment. 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *see id.* at 1009 (Kennedy, J., concurring in part and concurring in the judgment). Fernandez's RICO convictions were predicated on the jury's finding that he had committed the crime of conspiracy to commit murder, a crime at least as grave as the drug possession at issue in *Harmelin*. Moreover, the defendant in *Harmelin* was a first-time offender, whereas Fernandez has a long history of serious criminal conduct. The Supreme Court has recently recognized that a defendant's history of felony recidivism is to be taken into account in the Eighth Amendment analysis. *Ewing v. California*, 538 U.S. 11, 20, 29, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (upholding sentence of twenty-five-years-to-life for grand theft because of defendant's long criminal history).

Given the gravity of Fernandez's crimes and his criminal history, his Eighth Amendment claim is meritless.[43]

▉▉▉▉ Fernandez also argues that Congress did not intend to incorporate sentencing disparities across different states into the RICO statute, and that we should not read the RICO statute to allow such disparities. We conclude, however, that the plain structure of the relevant RICO provisions establishes that Congress did intend sentences to be based on state law. Title 18 U.S.C. § 1961(1) provides that predicate racketeering acts include offenses under state law punishable by more than a year, and § 1963(a) provides that the maximum sentence for a RICO violation is life imprisonment "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." The RICO statute therefore contemplates that both the acts charged and the sentences imposed may vary according to the law of the state where the acts occurred. This situation is different from that presented in cases like *Ye v. INS*, 214 F.3d 1128, 1132 (9th Cir.2000), or *Taylor v. United States*, 495 U.S. 575, 590, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), the cases cited by Fernandez, where courts were interpreting a particular term in a federal statute ("burglary") and rejected the contention that its meaning should be determined by state law. The RICO statute contains none of the ambiguities about whether to incorporate state law that were present in those cases, but instead clearly accepts the inevitable variation that results

---

**43.** The fact that the sentences for conspiracy to murder in other states may be substantially lower does not change the result. Under 18 U.S.C. § 1963(a), Fernandez would have faced a maximum of 20 years had he been convicted of the same offenses in a state that did not punish conspiracy to murder with a life sentence. Given the seriousness of the crime and Fernandez's criminal history, the discrepancy is not sufficient to establish that Fernandez's life sentence was grossly disproportionate. *See Harmelin*, 501 U.S. at 1001, 111 S.Ct. 2680 ("The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.").

from incorporating state penalties into federal racketeering law.

Finally, Fernandez raises an equal protection challenge based on the fact that under RICO, similar criminal conduct is sentenced differently depending on the law of the state in which the acts took place. We rejected a similar challenge to the incorporation of state law into a federal statute in *United States v. Sacco,* and concluded that "[t]he fact that [18 U.S.C. § ] 1955 applies only in states where gambling is illegal does not result in a denial of equality under the law guaranteed by the due process clause of the fifth amendment. The absence of national uniformity does not render § 1955 unconstitutional." 491 F.2d 995, 1003 (9th Cir.1974) (en banc) (citation omitted). If Congress can make criminal liability dependent on state law, Fernandez offers no reason why it cannot also make sentencing dependent on state law if that is its intent. *Cf. United States v. Ibarra–Galindo,* 206 F.3d 1337, 1339–40 (9th Cir.2000) (holding that drug felony under state law can constitute an aggravated felony for federal sentencing guidelines purposes even if the same conduct would not constitute a felony under federal law).[44] In any event, the discrepancy here is not sufficiently egregious that we would find an equal protection violation.

## B. Fernandez's challenge to his life sentence on Count Two

Fernandez argues that he was incorrectly sentenced to life imprisonment on the RICO conspiracy count, because conviction on that count did not require a finding that he had committed any particular act, much less the murder con-

spiracy that justified a life sentence under California law. Fernandez is correct that a § 1962(d) conviction does not require a substantive violation under § 1962(c) to have been established, in that the prosecution need not prove that the necessary predicate acts have been successfully completed. *See Salinas,* 522 U.S. at 65, 118 S.Ct. 469 ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues ...."); *Oki Semiconductor Co.,* 298 F.3d at 774–75 ("It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy."); *Smith,* 247 F.3d at 537 ("In upholding the result in the *Salinas* case, the Supreme Court found that a violation of section 1962(c) was not a prerequisite to a violation of section 1962(d).").

Fernandez's further contention that there was no finding that he had in fact conspired to commit murder, at least as a predicate for count two, is incorrect. It is a well-established principle of RICO law that a murder conspiracy can be a predicate racketeering act under § 1962(c), *see, e.g., Shryock,* 342 F.3d at 967; *Pungitore,* 910 F.2d at 1134, and that predicate racketeering acts that are themselves conspiracies may form the basis for a charge and eventual conviction of conspiracy under § 1962(d). *See, e.g., United States v. Corrado,* 227 F.3d 528, 541–42 (6th Cir.2000) (citing *United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.1984), *overruled on other grounds by Salinas,* 522 U.S. at 61, 66, 118 S.Ct. 469); *Pungitore,* 910 F.2d at 1135 (3d Cir.1990). Even if the verdict for count two did not include

---

**44.** We note that the need for national uniformity is not as compelling in the context of criminal law—which has been traditionally a subject of state law—as it is in other contexts which are regulated primarily by the federal government. *See Cazarez–Gutierrez v. Ashcroft,* 382 F.3d 905, 912–914 (contrasting the need for uniformity in the context of criminal and immigration law).

any specific findings about the evidence underlying Fernandez's conviction, the jury explicitly found that he had conspired to murder three people as predicate acts for count one. It is evident, moreover, that his participation in the conspiracy to violate RICO included his conspiracies to commit substantive RICO violations.[45] The district court's reliance on Fernandez's conspiracies to commit murder to justify sentencing him to life imprisonment was not erroneous.[46]

## C. The district court's failure to consider making Sanchez's life sentence concurrent with his state term of imprisonment

 Sanchez argues that the district court erred in finding that it lacked discretion to make his federal life sentence concurrent with his current state term of imprisonment.[47] The government concedes that the district court erred in finding it had no discretion, 2003 WL 22706781 at *275; *see also United States v. Arellano–Torres,* 303 F.3d 1173, 1181 (9th Cir.2002), but argues that any error is harmless because Sanchez will spend the rest of his life in prison whether the federal sentence runs concurrent with or consecutive to his state sentence. *See United States v. Mendoza,* 121 F.3d 510, 513–14 (9th Cir.1997) (holding that sentencing error is harmless

if "the error did not affect the district court's selection of the sentence imposed"). In light of the government's concession that there was error, however, we deem it appropriate to vacate Sanchez's sentence and remand for re-sentencing, so that the district court may consider whether to exercise its discretion to run Sanchez's federal sentence concurrent with his state term of imprisonment.

## CONCLUSION

We affirm the convictions of all Appellants, and the sentences of Fernandez and Schoenberg. We vacate the sentences of Contreras and Gonzales, and remand those cases for resentencing consistent with the Supreme Court's eventual decisions in *Booker* and *Fanfan.* We also vacate Sanchez's sentence and remand for re-sentencing in accordance with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RE-SENTENCING IN PART. The Clerk shall stay the issuance of the mandate in all cases, except No. 01–50373 (Sanchez), until further order of the court.**[48]

---

**45.** This logic holds true even though a conspiracy to violate RICO and a conspiracy to commit a substantive RICO violation are legally distinct. *See, e.g., Corrado,* 227 F.3d at 541–42 ("A RICO conspiracy is considered a single object conspiracy with that object being the violation of RICO. ... [T]he underlying acts of racketeering in a RICO conspiracy are not considered to be the objects of the conspiracy, but simply conduct that is relevant to the central objective—participating in a criminal enterprise.") (internal citations and quotation marks omitted).

**46.** Moreover, no *Blakely* issue is presented by Fernandez's challenge to his RICO conspiracy conviction. As the district court noted during

sentencing, "the jury did find defendant guilty of conspiracy to commit murder, in violation of [California] penal code section[s] 182 and 187, violations which carry the possibility of a life sentence."

**47.** Sanchez has been serving a state sentence of thirty-seven-years-to-life since September 1990.

**48.** We note that the usual deadlines for the filing of petitions for rehearing will apply: any such petitions must be filed within fourteen days from the filing of this opinion absent an extension granted by the court. *See* Fed. R.App. P. 40(a)(1).